510 So.2d 885 (1987)
Rickey Bernard ROBERTS, Appellant,
v.
STATE of Florida, Appellee.
No. 68296.
Supreme Court of Florida.
July 2, 1987.
Rehearing Denied September 3, 1987.
*886 Geoffrey C. Fleck, Sp. Asst. Public Defender of Ordonez, Friend & Fleck, Miami, for appellant.
Robert A. Butterworth, Atty. Gen. and Nancy C. Wear, Asst. Atty. Gen., Miami, for appellee.
EHRLICH, Justice.
Rickey Bernard Roberts appeals his convictions of first-degree murder, armed sexual *887 battery and armed kidnapping and resulting sentences of death and imprisonment. We have jurisdiction, article V, section 3(b)(1), Florida Constitution, and affirm the convictions and sentences.
According to the state's key witness, Michelle Rimondi, during the early morning hours of June 4, 1984, she, the murder victim George Napoles, and Rimondi's friend Jammie Campbell were parked on the beach off the Rickenbacker Causeway near Key Biscayne drinking wine. While Campbell slept in the front passenger seat in Napoles' Omni, the appellant, Roberts, drove up to the Omni, got out of his car and asked Napoles and Rimondi what they were doing and for identification. Believing that Roberts was an undercover beach patrol officer, Napoles gave Roberts his driver's license. Roberts first frisked Napoles and then frisked Rimondi. When Roberts touched Rimondi on the breasts and thighs, Napoles became suspicious and asked Roberts for his identification. Roberts took Napoles to his car to get his identification. Once at the car, Roberts reached into the back seat and pulled out a baseball bat. Roberts then forcibly brought Napoles back to the Omni where he ordered Rimondi to face the interior of the Omni and not to turn around. Looking over her right arm, Rimondi saw Roberts repeatedly hit Napoles in the back of the head with the bat. Rimondi was unable to scream. Roberts then pushed Napoles' body towards the beach. Still holding the bat, he grabbed Rimondi and pulled her near the body and told her that if she did not take her clothes off she "was going to get it just like George or worse." When it appeared that someone might be coming, Roberts told Rimondi to get dressed and forced her into his car where he eventually raped her. Roberts then left the beach with Rimondi. Realizing that he had lost his wallet, Roberts returned to the beach with Rimondi, found the wallet and again left the scene. Roberts raped Rimondi a second time, before taking her to her sister's boyfriend's house where she was staying that weekend. Napoles' body was discovered on the beach later that morning.
Soon after the body was discovered, Rimondi informed the police that a black man wearing a shirt with the name "Rick" on the front had killed Napoles and raped her. After receiving a tip that Roberts was the "Rick" responsible for the murder, detectives questioned Roberts concerning the incident. Rimondi identified both Roberts and his car. Roberts initially denied having been on Key Biscayne in the past two months. However, after he was told his palm print was found on the roof of Napoles' Omni, Roberts admitted being on the Key during the early morning hours of June 4 but maintained that he had merely picked up Rimondi hitchhiking on the causeway. According to Roberts, who testified at the trial, Rimondi told him that she needed a ride home because her friends had passed out from drinking wine. Roberts claims that after Rimondi got into his car she asked him to return to her friend's car to get her purse. While Rimondi was getting her purse, Roberts claims to have leaned into the car to look at her friend on the front seat, placing his hand on the roof. According to Roberts after retrieving the purse, he then drove Rimondi home. Roberts claimed he never saw Napoles and never raped Rimondi.
Roberts was indicted for first-degree murder, armed sexual battery, armed kidnapping and two counts of armed robbery. He was found guilty of first-degree murder, armed sexual battery and armed kidnapping and not guilty of either robbery count. In connection with the armed sexual battery and armed kidnapping convictions, Roberts was sentenced to concurrent life sentences. In accordance with the jury's recommendation, the trial court imposed the death penalty finding four aggravating circumstances: (1) the defendant had been previously convicted of a violent felony, section 921.141(5)(b), Florida Statutes; (2) at the time of the commission of the capital felony the defendant was under a sentence of imprisonment, section 921.141(5)(a), Florida Statutes; (3) the capital felony was committed while the defendant was engaged in the commission of or the attempt to commit a sexual battery, section 921.141(5)(d), Florida Statutes; and (4) the *888 capital felony was especially heinous, atrocious or cruel, section 921.141(5)(h), Florida Statutes. The trial judge found no mitigating circumstances.

Guilt Phase
Roberts first challenges the sufficiency of the evidence to support the first-degree murder conviction. He argues that the evidence is insufficient to establish that the killing was premeditated or that it occurred while he was "engaged" in the perpetration of a felony.
We reject Roberts' claim that the evidence in this case reflects an "irrational, spontaneous assault devoid of deliberation, reflection or preparation" rather than a fully formed purpose to kill. In rejecting a similar argument we recently noted in Wilson v. State, 493 So.2d 1019 (Fla. 1986), that:
Premeditation is more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose to kill may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act... . Whether or not the evidence shows a premeditated design to commit a murder is a question of fact for the jury which may be established by circumstantial evidence.
Id. at 1021 (citations omitted).
As in Wilson, the evidence in this case does not support the conclusion that the murder was the result of a "spontaneous, blind and unreasoning reaction" to the circumstances leading up to the murder. Compare Forehand v. State, 126 Fla. 464, 171 So. 241 (1936) (first-degree murder conviction reduced to second-degree where evidence supported conclusion that murder was the result of a "blind and unreasoning" response to being hit by victim with a blackjack). When Napoles questioned Roberts' identity, Roberts took Napoles to his car, got the bat, walked Napoles back to the Omni, instructed Rimondi not to look and then repeatedly bludgeoned Napoles in the back of the head with the bat. This sequence of events alone evidences a fully formed conscious purpose to kill Napoles.
We also find that there was sufficient evidence upon which to base a felony murder conviction. Section 782.04(1)(a), Florida Statutes (1983) provides, in pertinent part:
The unlawful killing of a human being ... [w]hen committed by a person engaged in the perpetration of or in the attempt to perpetrate, any ... sexual battery ... is murder in the first degree.
Although as Roberts points out, it is clear from the record that the murder did not occur "during" the actual sexual battery on Rimondi, the murder of Napoles and subsequent sexual battery and kidnapping of Rimondi were part of the same criminal episode. See Jefferson v. State, 128 So.2d 132, 137 (Fla. 1961) ("It is a homicide committed during the perpetration of a felony, if the homicide is part of the res gestae of the felony"); W.S.L. v. State, 470 So.2d 828 (Fla. 2d DCA 1985), quashed on other grounds, 485 So.2d 421 (Fla. 1986) (conviction of felony murder proper where murder and felony are part of one criminal episode). Pretending to be some type of law enforcement officer, Roberts approached what appeared to be either a lone female or a couple in a "lover's lane" area of a deserted beach. While frisking Rimondi, Roberts touched her breast and thighs, causing Napoles to become suspicious and to ask for identification. In response to this request, Roberts got the bat and beat Napoles until he appeared to be unconscious. He then grabbed Rimondi and attempted to rape her near the body. However, when it appeared that someone might be coming, Roberts instructed Rimondi to put her pants on and then immediately forced her into his car where he eventually raped her. The only logical inference to be drawn from this scenario is that Roberts killed Napoles in furtherance of his intent to rape Rimondi.
Although Roberts does not challenge the convictions for armed sexual battery and armed kidnapping, we also find that these convictions are adequately supported by the record.
*889 Roberts' second point on appeal involves the trial court's failure to attend the jury's view of the tract of beach where the body was found. Roberts argues that the trial court's failure to attend the view, as mandated by section 918.05, Florida Statutes (1983), constituted a fundamental per se reversible error under this Court's decisions in McCollum v. State, 74 So.2d 74 (Fla. 1954) and Dodd v. State, 209 So.2d 666 (Fla. 1968).
Section 918.05, Florida Statutes provides:
View by jury.  When a court determines that it is proper for the jury to view a place where the offense may have been committed or other material events may have occurred, it may order the jury to be conducted in a body to the place, in custody of a proper officer. The court shall admonish the officer that no person, including the officer, shall be allowed to communicate with the jury about any subject connected with the trial. The jury shall be returned to the courtroom in accordance with the directions of the court. The judge and defendant, unless the defendant absents himself without permission of court, shall be present, and the prosecuting attorney and defense counsel may be present at the view.
(Emphasis added). In McCollum we held that since section 918.05 contains "a clear and explicit legislative mandate" that the trial judge shall be present at a view by the jury, the defendant's failure to make a timely objection to the court's failure to attend such a view will not be considered an implied waiver of this requirement.
In the instant case, during the guilt phase of the trial after approximately fourteen hours of deliberation, the jury requested a view of the scene of the crime. After a discussion between defense counsel, the prosecuting attorneys and the trial judge, the request was granted and the jurors were instructed that they would be taken to the site where the location of the body would be pointed out to them. The jury was also instructed: "Nobody will be discussing the case with you. You are not to talk to anybody out there about the case... . When you are out there, do not discuss the case amongst yourselves."
The attorneys for the defense and the state preceded the jury to the site to determine the location of the body. After making this determination, the record reflects that both attorneys then left. The record contains the following account concerning the view:
[STATE]: You're going into the trial and, from Monday, and I forgot and lost track of the day, but we had come into chambers and discussed based upon the jury's request that they be allowed to go out and view the scene.
THE COURT: Yes.
[STATE]: Defense Counsel was present as well as Mr. Howell and myself, and I think all parties concerned agreed that it would be a good idea to have the jury go out to the scene and the lawyers would precede them and find the approximate position of the body and, without any discussion with the jury, advise the bailiff of that location then lifewise (sic) as to exactly what happened.
THE COURT: Were you there to watch the jury from a distance?
[STATE]: No.
THE COURT: You all left?
[STATE]: We left and, as far as walking to the positions, we got in the car and left.
The only thing what happened was put on the record, just to be on the safe side, is that the counsel for defense waived the presence of the Defendant there.

THE COURT: Counsel for the Defendant, is that correct?
[DEFENSE COUNSEL]: Yes, sir, that's correct, what I indicated before.
[STATE]: I think that was the discussion. For the record, there was a discussion in the courtroom between, in the presence of the Court, between yourself and your Defendant as to this issue.
[DEFENSE COUNSEL]: That's correct, Your Honor. Overall, we admit that counsel waived the presence of, Your Honor.

THE COURT: At the scene that you viewed, is that correct?

*890 [DEFENSE COUNSEL]: Yes, sir. I said that's correct.
(Empahsis added.)
It is apparent from the above discussion that neither the defendant nor the trial judge were present at the view. However, under the circumstances, we cannot agree with Roberts that the trial court's absence mandates per se reversal under McCollum. We view the above excerpt as an acknowledgement of an express waiver by defense counsel of the presence of both the defendant and the trial court. Roberts points to the comma between the words "of" and "Your Honor" in the last italicized sentence quoted above, contending that the words "the defendant" were left out of the transcript. We have been informed of no motion to correct the record and without such correction the only reasonable reading of the sentence in question is as an acknowledgement by counsel of his express waiver of the trial court's presence at the view.
Roberts contends that even assuming his trial counsel waived the judge's presence, he did not acquiesce in or ratify this waiver. See Garcia v. State, 492 So.2d 360 (Fla.), cert. denied, ___ U.S. ___, 107 S.Ct. 680, 93 L.Ed.2d 730 (1986); Amazon v. State, 487 So.2d 8 (Fla.), cert. denied, ___ U.S. ___, 107 S.Ct. 314, 93 L.Ed.2d 288 (1986). We find such acquiescence or ratification unnecessary under the circumstances present in this case and hold that defense counsel's express waiver of the trial court's presence at the jury view was adequate. To hold otherwise would allow Roberts to benefit from this clearly invited error.
We also reject Roberts' claim that his absence from the jury view requires reversal.[1] Roberts argues that although it is clear from the record that defense counsel waived his presence after discussing the matter with him, reversal is mandated because there is no record of a knowing and intelligent waiver nor is there evidence of a subsequent acquiescence in or ratification of the waiver by counsel. See Amazon v. State, 487 So.2d at 11. We find this case distinguishable from Amazon. Amazon, like Roberts, argued that it was fundamental error for the trial court to accept a waiver by counsel rather than conducting a hearing to determine whether the defendant knowingly and intelligently waived his presence. In Amazon we felt it necessary to relinquish jurisdiction for an evidentiary hearing on whether the waiver was knowing and intelligent because testimony was presented at the view. In a case such as this, where the view occurs during the deliberations, and no evidence or testimony is presented at the view, a defendant's absence can in no way thwart the fairness of the proceeding. Therefore, we conclude that the express waiver by defense counsel after consultation with the defendant serves as an adequate waiver of Roberts' right to be present at the jury view. See Muehleman v. State, 503 So.2d 310, 315 (Fla. 1987).
Roberts' next point on appeal involves three other instances in which Roberts alleges that he was absent from the proceedings. Roberts argues that these absences violated his right to be present at all crucial stages of the trial. Roberts first points to two pretrial conferences claiming that he was not present at the afternoon session of the October 24 conference and was absent from the entire December 2 proceeding. Roberts relies on Florida Rule of Criminal Procedure 3.180(a)(3) which provides that a defendant shall be present "[a]t any pre-trial conference; unless waived by Defendant in writing." The record does not reflect whether Roberts was present or absent during these proceedings. See United States v. Bokine, 523 F.2d 767 (5th Cir.1975) (The burden is upon the appellant to show that he was absent during proceedings before he would have even an arguable complaint.). However, even assuming that Roberts was involuntarily absent on these two occasions, neither absence thwarted the fundamental fairness of the proceedings. See Garcia v. *891 State, 492 So.2d at 363-64. During the afternoon session of October 24, the following motions were considered: (1) The defendant's motion for a daily transcript of the trial  denied; (2) Defendant's motion to strike a/k/a on endictment  denied, later granted; (3) Defendant's motion concerning death penalty questions during voir dire and to empanel a separate sentencing jury  denied; (4) Defendant's motion for psychological evaluation of Michelle Rimondi  granted with limitations; (5) Defendant's request for presentence investigation  ruling withheld; (6) Defendant's motion for list of sentencing witnesses and exhibits  passed with court's comment that defendant had an "absolute right" to that information; (7) Defendant's motion to reopen depositions of Rimondi and others  granted with limitations; (8) Defendant's motion to prohibit dispersal of jury during recess  granted; (9) Defendant's motion to seek sequestration of jury  ruling withheld; (10) Defendant's motion concerning comments on his right to counsel  granted. During the December 2 conference the following motions were heard: (1) The defendant's motion to reopen the deposition of Denise Moon, Rimondi's rape counselor  denied; (2) Defendant's motion to restrict use of other crime evidence  granted; (3) Defendant's motion for release of grand jury transcript  denied; (5) State's motion to limit cross-examination of state witness Campbell  granted; (6) State's motion to limit cross-examination of state witness Rimondi  granted; (7) State's motion to limit inquiry into Rimondi's social history  ruling reserved, eventually granted. Although a number of the rulings on these motions were adverse to Roberts, each of the motions heard during these sessions involved matters in which Roberts, if present, could not have assisted defense counsel in arguing. Therefore, we find that the state has met its burden in showing that, if in fact the defendant was not present during these proceedings, he was not prejudiced. See id. at 364.
We also reject Robert's argument that his apparent absence during the discussion between the prosecuting attorneys, defense counsel and the trial court concerning the jury's request for the view requires per se reversal under this Court's decision in Ivory v. State, 351 So.2d 26 (Fla. 1977). In Ivory we held:
[I]t is prejudicial error for a trial judge to respond to a request from the jury without the prosecuting attorney, the defendant, and defendant's counsel being present and having the opportunity to participate in the discussion of the action to be taken on the jury's request. This right to participate includes the right to place objections on record as well as the right to make full argument as to the reasons the jury's request should or should not be honored.
Id. at 28.
In light of our recent clarification of this holding in Williams v. State, 488 So.2d 62 (Fla. 1986), and Meek v. State, 487 So.2d 1058 (Fla. 1986), Roberts' Ivory claim is without merit. In Williams we explained that the per se reversible error rule set forth in Ivory applies only to communications between the judge and jury which fall within the express notice requirements of Florida Rule of Criminal Procedure 3.410. 488 So.2d at 64. We do not consider a request for a view to be a request by the jury for "additional instructions or to have any testimony read to them" within the terms of rule 3.410. Further, and most significantly, even if we were to consider a request for a view to come within the terms of rule 3.410, in Meek we explained that rule 3.410 does not require the presence of the defendant in addition to counsel and our decision in Ivory should not be read to establish such a requirement. 487 So.2d at 1059. In the instant case both the prosecuting attorney and defense counsel were given notice of the request and both were given an opportunity to argue as to whether the request should or should not be granted. Roberts was present when the trial court granted the jury's request and instructed them on the view. Under these circumstances, we find no error. See Meek, 487 So.2d at 1059; and Fla.R.Crim.P. 3.180(a)(5).
As Roberts' next point on appeal, he argues that the trial court's restriction of *892 his direct examination testimony was an abridgement of his right to testify on his own behalf, his right to present a full defense and his right of confrontation under the fifth, sixth and fourteenth amendments to the United States Constitution. During direct examination by defense counsel Roberts attempted to testify that during the forty-five-minute drive from Key Biscayne, where he allegedly picked up Rimondi hitchhiking, to the place where he eventually dropped her off, he and Rimondi discussed the fact that she worked for an escort service as a prostitute. Consistent with his prior ruling in limine prohibiting evidence concerning Rimondi's prior sexual conduct, the Court sustained the state's objection to this testimony.
Roberts contends that testimony concerning the alleged prostitution does not fall within the parameters of Florida's Rape Shield Law, section 794.022, Florida Statutes, which provides in pertinent part:
(2) Specific instances of prior consensual sexual activity between the victim and any person other than the offender shall not be admitted into evidence in a prosecution [for sexual battery]. However, such evidence may be admitted if it is first established to the court in a proceeding in camera that such evidence may prove that the defendant was not the source of semen, pregnancy, injury or disease; or, when consent by the victim is at issue, such evidence may be admitted if it is first established to the court in a proceeding in camera that such evidence tends to establish a pattern of conduct or behavior on the part of the victim which is so similar to the conduct or behavior in the case that it is relevant to the issue of consent.
(3) Notwithstanding any other provision of law, reputation evidence relating to a victim's prior sexual conduct shall not be admitted into evidence in a prosecution [for sexual battery].
We disagree and find that any reference to Rimondi's alleged activities as a prostitute was properly excluded under section 794.022. Although as Roberts points out, in a purely technical sense reference to a conversation concerning Rimondi's alleged prostitution is not evidence of a "specific instance of prior consensual sexual activity" with one other than the defendant under section 794.022(2), nor is it reputation evidence under section 794.022(3), we believe this is precisely the type of evidence which Florida's Rape Shield Law was designed to cover. Section 794.022(2) and (3) is a codification of the rule of relevancy as it applies to the prior sexual conduct of a sexual battery victim. Marr v. State, 494 So.2d 1139 (Fla. 1986); Kaplan v. State, 451 So.2d 1386 (Fla. 4th DCA 1984). Although this testimony would likely be relevant to a defense of consent, Roberts does not claim consent; he has consistently maintained he did not have sexual relations with Rimondi.
We recognize that if application of Florida's Rape Shield Law interferred with Roberts' confrontation rights or otherwise operated to preclude Roberts from presenting a full and fair defense, the statute would have to give way to these constitutional rights. See Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). However, we reject Roberts' contention that the "specifics" of his conversation with Rimondi were necessary to refute her depiction of a "forced and hostile dialogue" and thus, exclusion of that aspect of his version of the conversation impermissibly limited his ability to present a full and fair defense. Rimondi had testified that during the drive from the causeway, Roberts had told her that he was a "professional hit man" and that he had threatened to harm her and her family. Roberts was allowed to give his account of this conversation and to refute every aspect of Rimondi's testimony. Roberts testified that they "had general conversations about occupation." The only limit on Roberts' testimony was on the specific type of employment Rimondi was allegedly engaged in. We find that the exclusion of this one otherwise irrelevant and highly prejudicial aspect of Roberts' version of the conversation in no way hindered Roberts' presentation of a complete defense.
Roberts' fifth point on appeal involves the state's cross-examination of defense *893 witness Cherie Gillotte. The defense called Gillotte to testify concerning statements made to her by Rimondi shortly after the murder which were inconsistent with Rimondi's testimony at trial. The main inquiry by defense counsel proceeded as follows:
Q. Miss Gillotte, Did Michelle Rimondi tell you specifically that George Napoles was dancing at the beach as the man pulled up with his car? Yes or No?
A. Yes.
Q. No, Did Michelle Rimondi tell you specifically that at the time the man started to beat George Napoles to death, that she was screaming, starting to scream; yes or no?
A. Yes.
Q. Did Michelle Rimondi tell you that after the man beat George Napoles to death, that the man raped her next to George's body by the car. Yes or no?
A. Yes.
Roberts maintains that the state was allowed to cross-examine Gillotte outside the scope of direct examination, thus, eliciting prior consistent statements made by Rimondi which had the effect of improperly bolstering her testimony at trial. Roberts maintains that the cross-examination should have been limited to the three specific areas of the conversation which were brought out on direct. We reject Roberts' limited perception of the proper scope of cross-examination and find that it was not an abuse of discretion for the trial court to allow the state to cross examine Gillotte concerning the entire conversation in which the three prior inconsistent statements were made. As stated in Coco v. State, 62 So.2d 892 (Fla. 1953):
[W]hen the direct examination opens a general subject, the cross-examination may go into any phase, and may not be restricted to mere parts which constitute a unity, or to the specific facts developed by the direct examination. Cross-examination should always be allowed relative to the details of an event or transaction a portion only of which has been testified to on direct examination. As has been stated, cross-examination is not confined to the identical details testified to in chief, but extends to its entire subject matter, and to all matters that may modify, supplement, contradict, rebut or make clearer the facts testified to in chief by the witness on cross-examination.
62 So.2d at 895 (quoting 58 Am.Jur. Witnesses § 632 (1948)).
On direct examination Roberts elicited testimony from Gillotte concerning three isolated statements made during a conversation with Rimondi. The state on cross-examination elicited testimony concerning the circumstances surrounding this conversation, along with the context of the entire conversation in an apparent attempt to establish that it was possible that Gillotte may have merely misunderstood Rimondi or that Rimondi may have misspoken considering the highly emotional state that each was in at the time of the conversation. This conclusion is supported by the following excerpt from the transcript:
[State] Q. Now, during the period of time that Michelle was telling you what was going on, was she still upset?
[Gillotte] A. Yes, I was comforting her.
[State] Q. Were you upset as well?
[Gillotte] A. Yes.
[State] Q. Can you say right now, as you sit here before this jury a year and a half later that you remember exactly word for word everything that Michelle Rimondi told you from the moment you first started talking to the moment you stopped talking?
[Gillotte] A. Not individually, but just about.
[State] Q. You remember then basically the gist of what she told you?
[Gillotte] A. Yes sir.
[Prosecuting Attorney] Q. Stories of what she told you?
[State] Q. Right.
[Gillotte] A. Yes sir.
The prosecuting attorney then proceeded to question Gillotte concerning those aspects of the conversation which were consistent with Rimondi's trial testimony. It was not error for the state to attempt and clarify *894 the three inconsistent statements by placing them in context for the jury to explain.

Sentencing Phase
As his sixth point on appeal Roberts argues that the death penalty was improperly applied in his case.[2] First, Roberts contends that the trial court erred in finding that the murder of Napoles was especially heinous, atrocious or cruel. § 921.141(5)(h), Fla. Stat. (1985). We find no merit to Roberts' contention that since Napoles was killed by what Roberts characterizes as a rapid series of blows to the back of the head which he did not anticipate this aggravating factor was not supported by the evidence. The evidence amply supports this finding. The evidence does establish that Napoles was killed as a result of numerous blows to the back of the head. However, evidence of severe injury to Napoles' hands supports the conclusion that after the initial blow from behind, Napoles attempted to fend off further blows. Evidence of such defensive wounds has been held sufficient to support a finding that the murder was especially heinous, atrocious or cruel. See Wilson v. State, 493 So.2d 1019 (Fla. 1986) (finding that murder was especially heinous, atrocious or cruel was supported by evidence that victim was brutally beaten while attempting to fend off blows to the head, before he was fatally shot.); Heiney v. State, 447 So.2d 210 (Fla.) (murder was especially heinous, atrocious or cruel where victim received defensive wounds to hands while trying to fend off seven severe hammer blows to the head), cert. denied, 469 U.S. 920, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984).
Roberts also challenges the trial court's finding that the capital felony was committed while the defendant was engaged in the commission of or attempt to commit a sexual battery. § 921.141(5)(d), Fla. Stat. (1985). We reject Roberts' contention that because Napoles was murdered prior to the actual consummation of the sexual battery this aggravating factor does not apply. As noted in our earlier discussion of felony murder, the evidence in this case is sufficient to support a conclusion that Roberts killed Napoles in furtherance of his intent to rape and kidnap Rimondi. The murder was merely an early link in a chain of events calculated to set the stage for the sexual battery.
We also reject Roberts' claim that the trial court erred in failing to find as mitigating factors that: 1) the murder was committed while Roberts was under the influence of extreme mental and emotional disturbance, section 921.141(6)(b), Florida Statutes (1985), and 2) his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, section 921,141(6)(f), Florida Statutes (1985). Roberts maintains that the trial court abused its discretion by failing to find these two mitigating factors based on the "uncontradicted" testimony of three expert psychiatric witnesses that Roberts suffered from lesions of the brain causing "organic brain damage." The trial court has broad discretion in determining the applicability of mitigating circumstances urged. See Johnston v. State, 497 So.2d 863, 871-72 (Fla. 1986); Daugherty v. State, 419 So.2d 1067, 1071 (Fla. 1982), cert. denied, 459 U.S. 1228, 103 S.Ct. 1236, 75 L.Ed.2d 469 (1983). In determining whether mitigating circumstances are applicable in a given case, the trial court may accept or reject the testimony of an expert witness just as he may accept or reject testimony of any other witness. See Bates v. State, 506 So.2d 1033 (Fla. 1987) (Expert testimony is not conclusive even where uncontradicted). It is apparent from the following excerpt of the trial judge's sentencing order that he considered the expert testimony presented in support of these factors but found this testimony unpersuasive.
Counsel for the Defense presented testimony as to the defendant's mental condition and/or capacity at the time of the offense. The opinions of those witnesses were based, in part, on psychological *895 tests interviews with the defendant and review of the defendant's school, prison and medical/psychiatric records. There was no evidence presented that C.A.T. Scans, X-Rays etc. or testing by qualified neurologists ever took place.
The witnesses for the Defense opined that the defendant has "lesions on his brains" which resulted in organic brain damage. They further opined that this condition existed at the time of the offense and that the use of alcohol and/or drugs would have caused this defendant to act in a violent rage-like state when confronted with a stressful situation and as a result of his "organic brain damage," the defendant would be under the influence of extreme mental or emotional disturbance and could not appreciate the criminality of his conduct or conform his conduct to the requirements of law.
The Court rejects these opinions and points out that the defendant gave no information to these witnesses as to:
(a) Whether he was using alcohol during or before the commission of this crime;
(b) Whether he was using alcohol during or before the crime was committed;
(c) His mental state prior to, during, or after the event.
There is no testimony in this record, from any witness, that the defendant was exhibiting any of the behavioral characteristics at the time of the murder, which would support or corroborate the bald assertions of the existence of extreme emotional or mental disturbance.
We also reject Roberts' argument that death is not proportionately warranted in this case because "the killing here was most likely upon reflection of a short duration as was the case in Wilson." We find our recent decision in Wilson, 493 So.2d 1019, clearly distinguishable. In Wilson, the murder of Sam Wilson, Sr., was the climax of what we characterized as "a heated, domestic confrontation." The defendant in that case began attacking his stepmother with a hammer when she told him to keep out of the refrigerator. When Wilson, Sr., came to her aid, the defendant, Wilson, Jr., proceeded to beat him in the head with the hammer. The struggle continued throughout the house. When the stepmother got a pistol at Wilson, Sr.'s, request, Wilson, Jr. grabbed it and shot his father in the forehead. We concluded that under those circumstances "the killing, although premeditated, was most likely upon reflection of a short duration" and concluded that death was inappropriate in that case. 493 So.2d at 1023. In the instant case, the record reflects that when Napoles asked Roberts for identification, Roberts calmly walked Napoles over to his car, took out the bat, walked Napoles back to Napoles' car and proceeded to repeatedly beat him in the back of the head with the bat. We find none of the factors which led us to conclude that the death penalty was inappropriate in Wilson present in this case.
We also find no merit to Roberts' claim that the death penalty in Florida is applied in a discriminatory fashion based upon the race of the victim and the sex of the offender. See Thomas v. State, 421 So.2d 160 (Fla. 1982); See also McCleskey v. Kemp, ___ U.S. ___, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); Wicker v. McCotter, 798 F.2d 155 (5th Cir.1986).
Accordingly, finding no reversible error in this case, we affirm the convictions for armed sexual battery and armed kidnapping and the sentences attendant thereto. We also affirm the conviction for first-degree murder and sentence of death.
It is so ordered.
McDONALD, C.J., and OVERTON, SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] A defendant's presence at a jury view is required under both § 918.05, Fla. Stat. and Fla.R.Crim.P. 3.180(a)(7).
[2] Roberts does not challenge the trial court's finding that: 1) he had been previously convicted of a violent felony, rape and assault with intent to commit murder or 2) at the time of the commission of this offense Roberts was on probation in connection with that conviction.