ROTHENBERG, J.
In this petition for writ of certiorari, the State of Florida (“the State”) seeks quashal of the trial court’s order denying the State’s motion to declare Michelle Rimondi (“Ms.Rimondi”) “unavailable” pursuant to section 90.804(l)(b), Florida Statutes (2013), and to admit her sworn former trial testimony during the resentencing proceeding of the defendant, Rickey Bernard Roberts a/k/a Less McCullers (“the defendant”). Because the trial court’s order departs from the essential requirements of law and will result in material injury that cannot be remedied on appeal, we grant the petition and quash the order under review.

PROCEDURAL BACKGROUND

In 1985, the defendant was convicted of the first-degree murder of George Ñapóles (“Ñapóles”) and the armed sexual battery and armed kidnapping of Ms. Rimondi. Upon the jury’s recommendation, the defendant was sentenced to death for the first-degree murder of Ñapóles and to concurrent life sentences for the armed sexual battery and armed kidnapping of Ms. Ri-mondi. In 1987, the Florida Supreme Court affirmed the defendant’s convictions and sentences. Roberts v. State, 510 So.2d 885 (Fla.1987).
During the past twenty-seven years, the defendant has litigated numerous postcon-viction motions and habeas corpus petitions in Florida state and federal courts.[1] Ultimately, the defendant was granted a new sentencing proceeding. Roberts v. *376 State, 840 So.2d 962, 978 (Fla.2002). Just prior to the commencement of the new sentencing proceeding, the State filed a motion seeking to introduce Ms. Rimondi’s former sworn trial testimony based on her “unavailability as a witness” under section 90.804(l)(b) because Ms. Rimondi refuses to testify. The trial court’s denial of the State’s motion to declare Ms. Rimondi unavailable and to admit her former sworn trial testimony is the subject of this petition.
Pursuant to section 90.802, Florida Statutes (2013), hearsay evidence is inadmissible except as provided by statute. Section 90.804 provides some exceptions to the hearsay rule where the declarant is “unavailable.” “Unavailability” is defined as follows, and the State is proceeding under the highlighted subsection, (l)(b), to assert Ms. Rimondi’s unavailability:
(1) Definition of unavailability.— “Unavailability as a witness” means that the declarant:
(a)Is exempted by a ruling of a court on the ground of privilege from testifying concerning the subject matter of the declarant’s statement;
(b)Persists in refusing to testify concerning the subject matter of the de-clarant’s statement despite an order of the court to do so;
(c) Has' suffered a lack of memory of the subject matter of his or her statement so as to destroy the declarant’s effectiveness as a witness during the trial;
(d) Is unable to be present or to testify at the hearing because of death or because of then-existing physical or mental illness or infirmity; or
(e) Is absent from the hearing, and the proponent of a statement has been unable to procure the declarant’s attendance or testimony by process or other reasonable means.
§ 90.804(1) (emphasis added).
If the declarant is unavailable pursuant to section 90.804(1), section 90.804(2) provides certain exceptions to the hearsay rule. The State sought to introduce the former testimony of Ms. Rimondi, the victim of the armed sexual battery and the armed kidnapping and a witness to the first-degree murder of Ñapóles, under sections 90.804(l)(b) and 90.804(2)(a). Section 90.804(l)(b) provides that a witness is “unavailable” if he or she “[pjersists in refusing to testify concerning the subject matter of the declarant’s statement despite an order of the court to do so,” and section 90.804(2)(a) expressly permits the introduction of the former testimony of a witness who is unavailable under section 90.804(1). Specifically, section 90.804(2)(a) provides:
(2) HEARSAY EXCEPTIONS. — The following are not excluded under s. 90.802, provided that the declarant is unavailable as a witness:
(a) Former testimony. — Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

THE EVIDENCE RESULTING IN THE DEFENDANT’S CONVICTION

The evidence presented at the defendant’s trial in 1985 is summarized as follows. Ms. Rimondi, who was sixteen years old, her friend Jamie Campbell (“Campbell”), who was also sixteen years old, and *377 Ñapóles, who was twenty years old, drove together to the beach off of the Rickenbacker Causeway near Key Biscayne the night of June 3, 1984, parked the car, and shared a bottle of wine. Campbell eventually fell asleep. While Campbell slept, the defendant drove up in a Toyota, pulled off of the roadway, and parked the Toyota near Ñapóles’ car. The defendant exited the Toyota, approached Ñapóles’ car, demanded to see Ñapóles’ and Ms. Rimondi’s identifications, and asked what they were doing on the beach. Ms. Rimondi and Ñapóles exited their car, and, believing the defendant was an undercover beach patrol officer, Ñapóles handed his driver’s license to the defendant. Campbell did not stir and continued to sleep.
After examining Ñapóles’ driver’s license, Roberts conducted a “pat-down search” of Ñapóles and then proceeded to “search” Ms. Rimondi. When the defendant began fondling Ms. Rimondi as he “searched” her, Ms. Rimondi and Ñapóles became suspicious, and Ñapóles demanded to see the defendant’s police identification. The defendant told Ñapóles his identification was in his vehicle. Ñapóles followed the defendant to his vehicle, and when they arrived at the defendant’s vehicle, the defendant reached into the back seat, pulled out a baseball bat, forced Ñapóles to walk back to Ñapóles’ vehicle, and ordered Ñapóles to resume the frisk position up against the car.
Although the defendant told Ms. Rimon-di to look away, Ms. Rimondi watched the defendant strike Ñapóles across the back of his head with the bat, and, as Ñapóles stumbled backwards, she saw the defendant swing the bat again, striking Ñapóles’ back. Ms. Rimondi, who was only a couple of feet away from Ñapóles, watched Ña-póles fall facedown on the rocky shore. Although Ñapóles tried to protect his head with his hands, the defendant continued to beat Ñapóles with the bat, and, during the beating, Ms. Rimondi heard Ñapóles moaning. The defendant then pushed Ña-póles’ body behind the car and towards the water.
While still holding the bat, the defendant grabbed Ms. Rimondi’s arm and pulled her towards Ñapóles, who was lying facedown on the sand. The defendant then pushed Ms. Rimondi to the ground and threatened that if she did not take her clothes off, she “was going to get just like [Ñapóles] or worse.” After Ms. Rimondi began to remove her clothes, the defendant heard a car approaching and ordered Ms. Rimondi to get into his car. With Ms. Rimondi in his vehicle, the defendant backed his vehicle along the beach. After the approaching car passed by, the defendant parked his vehicle and raped Ms. Rimondi.
After raping Ms. Rimondi, the defendant forced Ms. Rimondi to remain in his vehicle with him, and they left the beach. When Ms. Rimondi asked if Ñapóles was alive, the defendant laughed and said, “No, he’s dead as a doorknob.” For the next couple of hours, the defendant continued to drive while .trying to decide what to do with Ms. Rimondi and while Ms. Rimondi tried to convince the defendant to let her live. The defendant told Ms. Rimondi that his “boss” would be mad if he did not kill Ms. Rimondi because she witnessed Ña-póles’ murder. He also told Ms. Rimondi that he “killed people for a living.”
As the defendant approached a tollbooth on the causeway, he realized he had dropped his wallet on the beach, so he drove back to where he had raped Ms. Rimondi to search for his missing wallet. After locating the wallet, the defendant walked over to Ñapóles, turned him over, and checked his throat for a pulse. When Ms. Rimondi asked if Ñapóles was still alive, the defendant told her Ñapóles was still breathing.
*378 After leaving the beach with Ms. Rimon-di for the second time, the defendant continued to drive. When he stopped at a red light and saw Ms. Rimondi looking at two police officers standing on the sidewalk, the defendant pointed a large gun at Ms. Rimondi and told her he would shoot her if she tried to alert the officers. He also threatened to cut her tongue out with a knife he kept on the dashboard. Eventually, the defendant parked the car at a dead end, ordered Ms. Rimondi to remove her clothes, and raped her again. He then drove Ms. Rimondi to the address where she was staying with her sister and her sister’s boyfriend and told her that if she called the police, he would kill Ms. Rimon-di and her family. Ms. Rimondi woke her sister’s boyfriend, who called the police.
The defendant was subsequently arrested, tried, convicted, and sentenced to death for the first-degree murder of Ña-póles and received life in prison for the armed sexual battery and the armed kidnapping of Ms. Rimondi.

THE STATE’S MOTION TO INTRODUCE MS. RIMONDI’S FORMER TRIAL TESTIMONY

Although the defendant’s convictions and sentences were initially affirmed, the defendant was granted a new sentencing proceeding before a new judge when it was discovered that the original trial judge requested the State, ex parte, to prepare the sentencing order. Roberts, 840 So.2d at 973.
Ms. Rimondi, who was sixteen years old when she was raped and kidnapped by the defendant and when she witnessed the defendant murder Ñapóles, was eighteen years old when she initially testified at the defendant’s trial. She is now approximately forty-five years old, and she has refused to testify yet again at the new sentencing proceeding. Based on her refusal to testify, the State filed a motion to have Ms. Rimondi declared “unavailable” pursuant to section 90.804(l)(b) and to permit her former trial testimony to be read to the jury in lieu of her live testimony at the new sentencing proceeding. When Ms. Ri-mondi appeared before the trial court for a hearing just prior to the defendant’s new sentencing proceeding, she testified that, although she understood that the trial court could order her to testify, hold her in contempt of court for refusing to testify, and fine and incarcerate her if she refused to testify, she would continue to refuse to testify.
Ms. Rimondi explained that she simply could not and would not testify due to the mental and emotional stress and effect of the proceedings. She explained the emo-cional toll the events of that evening have had on her, how difficult it has been for her to put the events of that evening behind her, and how she could not subject herself to reliving those events again after so many years. Ms. Rimondi informed the trial court she was so emotionally distraught that she was going to seek medical treatment, and, regardless of what the trial court did to her, she would not put herself through ■ it again and therefore would not testify. Despite Ms. Rimondi’s refusal to testify, the trial court denied the State’s motion to find Ms. Rimondi unavailable under section 90.804(l)(b) and to permit the State to read Ms. Rimondi’s former trial testimony to the new sentencing jury at the defendant’s new sentencing proceeding. This was clear error.

THE TRIAL COURT MISAPPLIED THE LAW

The trial court’s order denying the State’s motion demonstrates that the trial court applied the wrong standard in making its determination and, thus, departed from the essential requirements of law. *379 The trial court incorrectly focused its analysis on Ms. Rimondi’s ability to testify (whether she could testify) rather than on her refusal to testify (whether she would testify), as section 90.804(l)(b) requires. The trial court then balanced Ms. Rimon-di’s ability to testify with the defendant’s right to “confront and cross examine witnesses against him.” Specifically, the trial court found that because Ms. Rimondi was able to testify at a court-ordered deposition taken by defense counsel, she was also able to testify at the new sentencing proceeding, and concluded that when balancing “the emotional strain that testifying will clearly have on this witness ... [with] the Defendant’s right to confront and cross examine witnesses against him,” Ms. Ri-mondi was not unavailable.
A. The trial court’s finding that Ms. Rimondi is able to testify
The first error in the trial court’s analysis was the trial court’s reliance on its finding that, because Ms. Rimondi was able to testify at the court-ordered defense deposition with “no problems or difficulties,” she was able to testify at the resen-tencing proceeding. This finding is factually incorrect and irrelevant.
(1) The trial court’s finding that Ms. Rimondi had no problem or difficulties testifying during her deposition
Our review of the record reflects that, contrary to the trial court’s finding, Ms. Rimondi had a great deal of “problems and difficulties” testifying at the brief court-ordered deposition taken by defense counsel. Judy Ramey, a homicide counselor employed by' the State Attorney’s Office who attended Ms. Rimondi’s deposition, testified that Ms. Rimondi hesitated and had difficulty responding to some of the questions, and that Ms. Rimondi was crying and shaking throughout much of the deposition. Ms. Ramey explained that, although Ms. Rimondi was able to ultimately answer the questions asked of her during this deposition, Ms. Rimondi had to pause at least three or four times to stop crying and to compose herself. Ms. Ramey further testified that, after the deposition, she took Ms. Rimondi to her office where it took Ms. Ramey two hours to calm Ms. Rimondi down because Ms. Rimondi was crying and shaking. Ms. Rimondi told Ms. Ramey that “[t]his was the first time in thirty years that I have been in a good place in my life,” and she could not “go back to that dark place.” Thus, the trial court’s finding that Ms. Rimondi was able to testify at the court-ordered deposition with “no problems or difficulties” is contrary to the undisputed record and not supported by competent substantial evidence.
(2) The trial court’s reliance on Ms. Rimondi’s deposition
The trial court concluded that, because Ms. Rimondi was able to testify at her deposition, she was able to testify at the new sentencing proceeding. A review of Ms. Rimondi’s deposition, however, reflects that the brief inquiry[2] was limited to a few questions regarding where and how Ms. Rimondi, Ñapóles, and the defendant were standing when the defendant struck Ñapóles with the bat; the position of Ña-póles’ head when he received the first blow; the angle of the bat when it was swung; and the specific area of Ñapóles’ head that was struck on the first impact. Ms. Rimondi was not made to recount the entire episode, which lasted several hours and included the defendant raping Ms. Ri-mondi two times, the defendant holding *380 Ms. Rimondi at gunpoint as he drove around town while she begged him not to kill her, and the defendant’s initial insistence that she too must die. And, as Ms. Rimondi explained to the trial court, the defendant was not present during this brief deposition. Thus, Ms. Rimondi’s ability to testify during her brief deposition has little relevance to her ability (or willingness) to recount the entire episode in court with the defendant present.
(3) Ms. Rimondi’s ability to testify is irrelevant
A witness is unavailable under section 90.804(l)(b) if he or she “[persists in refusing to testify concerning the subject matter of the declarant’s statement despite an order of the court to do so.” Section 90.804(2)(a) provides that the former testimony of an unavailable witness is admissible at a subsequent proceeding.
Ms. Rimondi’s trial testimony clearly qualifies as “former testimony” of a witness under section 90.804(2)(a), as this testimony was “given as a witness at another hearing of the same ... proceeding.” Id. Whether Ms. Rimondi is “unavailable” under section 90.804(l)(b) is determined by whether she will testify, not whether she can testify. Thus, the determination of her unavailability under section 90.804(l)(b) is not dependent on whether Ms. Rimondi is “able” to testify, as the trial court found, but rather on whether she will continue to refuse to testify despite the trial court’s order and the possibility of sanctions being imposed.
Regarding Ms. Rimondi’s refusal to testify, the record reflects the following. Ms. Rimondi, who appeared before the trial court, testified under oath that she had not slept for the past forty-eight hours; the case has affected her for the past thirty years; the case continues to affect her emotionally and mentally; and if she testified, it would take her back to a “dark place” she was not willing to go. She further explained that she understood the trial court had the authority to force her to testify, she could be held in contempt of court, a civil penalty could be imposed, or she could be imprisoned if she refused to testify. Ms. Rimondi testified that requiring her to testify again would essentially re-victimize her, and, regardless of the penalties imposed, she would not testify.
Mayra Odio, who has been employed as a secretary by the State Attorney’s Office for approximately thirty-five years and who worked in that same capacity with the lawyers that prosecuted this case thirty years ago, testified that, because she had developed a relationship with Ms. Rimondi, Ms. Odio was asked to speak with Ms. Rimondi to try to convince her to testify at the new sentencing proceeding. Ms. Odio testified that, despite speaking with Ms. Rimondi about the possibility of testifying via video from the judge’s chambers or positioning her in the courtroom so that she would not have to look at the defendant, Ms. Rimondi stated that she would continue to refuse to testify at the new sentencing proceeding.
Mr. Howell, one of the prosecutors handling the new sentencing, also informed the trial court that he had again called Ms. Rimondi earlier that morning at work to implore her to testify. Ms. Rimondi, however, told Mr. Howell that she was leaving to go to the hospital because she was shaking so badly she thought she was going to faint.
This evidence is sufficient to find Ms. Rimondi unavailable under section 90.804(l)(b) and to admit her former trial testimony under section 90.804(2)(a). The trial court, however, did not consider this evidence or make a credibility determination because it incorrectly focused on *381 whether Ms. Rimondi was able to testify rather than on whether she would persist in refusing to testify despite the potential penalties that could be imposed. This was clear error.
B. Balancing Ms. Rimoiidi’s ability to testify with the defendant’s right to confront the witness
The trial court compounded its error when it applied the incorrect test by balancing the emotional toll on Ms. Rimondi against the defendant’s right to confront and cross-examine witnesses against him. The defendant’s counsel for the new sentencing, however, concedes that the admission of Ms. Rimondi’s former trial testimony, which was subject to vigorous cross-examination, does not violate the Confrontation Clause or Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), Additionally, section 90.804(2)('a) specifically permits the .introduction of the testimony of an “unavailable” witness given at another proceeding or in a deposition if the party against whom the testimony is being offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. § 90.804(2)(a). No balancing test is required; section 90.804(2)(a) creates a per se rule of admissibility.
C. The defendant has had the opportunity to develop Ms. Rimondi’s testimony by direct and cross-examination
Importantly, the defendant’s guilt is not an issue because his convictions have been affirmed on appeal. Ms. Rimondi was thoroughly examined and cross-examined at the original trial. She was also re-deposed by the defendant’s current defense lawyers in preparation for the new sentencing proceeding. Thus, defense counsel has had the opportunity to fully explore, and to obtain the evidence Ms. Rimondi would provide if she testified live at the new sentencing proceeding.
The defense claims it wants Ms. Rimon-di to testify live at the new sentencing proceeding because it wants to elicit testimony from Ms. Rimondi that may cast doubt on whether the killing of Ñapóles was heinous, atrocious, or cruel — an aggra-vator the State will be relying on in seeking a sentence of death. The defense bases its argument on the current medical examiner’s findings.
Due to the lengthy passage of time between the original sentencing proceedings and the resentencing (approximately twenty-nine years), the State will be calling a substitute medical examiner, Dr. Emma Lew, to testify at the resentencing proceeding. Dr. Lew has been deposed by the defendant’s current counsel. During her deposition, Dr. Lew testified that she disagrees with Dr. Mieozzi (the original medical examiner) that the evidence shows a fracture of Ñapóles’ skull. Dr. Lew explained that the bones, of the skull are naturally joined together by what are medically referred to as “sutures.” Although she could not rule out a slight separation of the bones at one of the “sutures.,” Dr. Lew testified that she did not believe a “true fracture” was present. Based on Dr. Lew’s deposition testimony, the defense retained its own expert medical examiner who requested information regarding where the defendant and Ñapóles were standing, how the bat was swung, and the angle of the bat upon impact with the Ñapóles’ skull. Thereafter, the defense requested, and was permitted, to re-depose Ms. Rimondi on those issues.
Importantly, although Dr. Lew disagreed with Dr. Micozzi’s opinion that Ña-póles’ skull was fractured during the homicide, she agreed entirely with Dr. Micozzi’s *382 opinion that the mechanism of death was blunt trauma to the head and that Ñapóles was struck on the head with an object consistent with a baseball bat, which caused injury to his brain and started the process that led to his death. Dr. Lew also agreed that, based on the injuries to Ñapóles’ brain, Ñapóles did not die immediately. Rather, after the beating, Ña-póles’ body began to work less efficiently, his heart began to beat slower and improperly, Ñapóles’ bodily fluids built up and backed up, and a slow process of asphyxia took place.
Thus, both medical examiners, Dr. Mi-cozzi and Dr. Lew, concluded Ñapóles’ death was a homicide; Ñapóles died from blunt trauma to the head consistent with having been struck with a baseball bat; the resultant injury to Ñapóles’ brain set in motion a slow process of asphyxia; and, therefore, Ñapóles did not die instantly.
After the case was remanded to the trial court to conduct a new sentencing proceeding, and just prior to picking a jury, the defense sought and was permitted to re-depose Ms. Rimondi for the limited purpose of asking her additional questions relating to the positioning of Ñapóles, the defendant, and the baseball bat during the attack, as requested by the defendant’s expert medical examiner, who may be called to testify at the new sentencing proceeding. The defendant, therefore, has been given a full opportunity to probe Ms. Rimondi’s testimony both at the original trial and subsequently on the issues relating to the new sentencing, and her testimony on those issues is admissible under sections 90.804(l)(b) and 90.804(2)(a).
Ms. Rimondi’s unavailability as a witness does not differ from that of the victim’s parents in Stano v. State, 473 So.2d 1282, 1286 (Fla.1985), who testified at Stano’s first trial but refused to testify at the second trial. Similarly, in Happ v. Moore, 784 So.2d 1091, 1101 (Fla.2001), Richard Miller, a jail house informant who testified against Happ in Happ’s first-degree murder death penalty case, refused to testify at Happ’s subsequent re-trial. In both cases, the Florida Supreme Court found that the trial court did not abuse its discretion by finding that the witnesses’ refusal to testify despite the possibility of a fine or incarceration being levied against them qualified the witnesses as unavailable pursuant to section 90.804(l)(b). See Happ, 784 So.2d at 1101; Stano, 473 So.2d at 1286.

CONCLUSION

Although well-intentioned, the trial court departed from the essential requirements of law by focusing on whether Ms. Rimon-di was able to testify rather than on her 'persistent refusal to testify when determining whether Ms. Rimondi was unavailable pursuant to section 90.804(l)(b) and whether her former trial testimony was admissible under section 90.804(2)(a). We also conclude that irreparable harm has been shown. The trial court’s determination that Ms. Rimondi was not unavailable was made just prior to selecting a new sentencing jury. Had the State been unable to introduce Ms. Rimondi’s prior trial testimony, the prejudice is obvious and could not have been remedied on direct appeal.[3] Ms. Rimondi is the sole eyewitness to the murder and is, herself, the *383 victim of the rapes and kidnapping. We therefore grant the State’s petition, quash the order under review, and remand with instructions that the trial court re-examine the issue of Ms. Rimondi’s unavailability under the correct standard if Ms. Rimondi continues to refuse to testify at the new sentencing proceeding.
Petition granted; order quashed; remanded with instructions.

. See Roberts v. Singletary, 794 F.Supp. 1106 (S.D.Fla.1992), aff'd, 29 F.3d 1474 (11th Cir.1994); State v. Roberts, 31 So.3d 177 (Fla.2010); Roberts v. State, 995 So.2d 186 (Fla.2008); Roberts v. State, 840 So.2d 962 (Fla. 2002); Roberts v. State, 678 So.2d 1232 (Fla.1996); Roberts v. Singletary, 626 So.2d 168 (Fla.1993); Roberts v. State, 568 So.2d 1255 (Fla.1990).

. The deposition transcript is 16 pages long and took less than 30 minutes to complete.

. The trial court’s non-final order in this case is not one of those enumerated orders that is expressly appealable under Florida Rule of Appellate Procedure 9.140(c)(1). The State’s appellate remedy is by certiorari if it can establish that the order at issue impairs the State’s ability to present its case. State v. Pettis, 520 So.2d 250 (Fla.1988). However, if the trial court were to issue its ruling after the jury is sworn (and jeopardy attached), the State would be without an appellate remedy. Weir v. State, 591 So.2d 593 (Fla.1991).