Derrick JOHNSON, Petitioner,

v.

Michael W. MOORE, Respondent.

No. 8:02–CV–1003–T–23EAJ.

United States District Court,
M.D. Florida,
Tampa Division.

Feb. 7, 2007.

Rochelle Anne Reback, Law Office of Rochelle A. Reback, Tampa, FL, for Petitioner.

John M. Klawikofsky, Office of the Attorney General, Tampa, FL, for Respondent.

### ORDER

MERRYDAY, District Judge.

Derrick Johnson petitions for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) and challenges his convictions for burglary with an assault and for sexual battery with the threat of force. An earlier order (Doc. 36) denies on the merits Ground Two and Ground Three of the original petition but appoints counsel to further develop Johnson's Ground One. This action proceeds on Johnson's memorandum in support of Ground One (Doc. 39), Moore's response (Doc. 43), and Johnson's reply (Doc. 49).

Johnson's conviction followed a brief trial in which the complainant, who was a minor, charged Johnson with rape and denied engaging in consensual sex with Johnson in exchange for drugs, the use of which she claimed to abhor.[1] (Respondent's Exhibit 1 vol. III at 138–40) On the other hand, Johnson testified that he and the complainant engaged in consensual sex in exchange for drugs and that, after the consensual sex, he refused to "pay" the complainant with either money or drugs, as promised. (Respondent's Exhibit 1 vol. III at 336–37, 346) Because both Johnson and the complainant agree that the sexual encounter occurred (but differ on the circumstances), the sole and governing issue at trial was Johnson's claim of consent—Johnson's claim that the complainant agreed to sex in exchange for drugs. This habeas corpus proceeding arises from the trial court's refusal, premised on Florida's "rape shield law," to permit the introduction of corroborating evidence that the complainant was a prostitute with a history of exchanging sex for drugs (or cash with which to buy drugs)—evidence directly relevant to the question of the complainant's consent, both the governing issue in the case and Johnson's only defense.

### FACTS

An information filed in Hillsborough County, Florida, charged Derrick Johnson with burglary of a dwelling with the intent to commit an assault or battery (Count One) and sexual battery with the threat of force (Count Two). (Respondent's Exhibit 1 vol. I at 12–13) Johnson pled not guilty and counsel was appointed. (Respondent's Exhibit 1 vol. I at 1–2)

Trial began and *voir dire* was conducted on January 16, 1996. (Respondent's Exhibit 1 vol. III at 1–102) Counsel delivered opening statements the following morning and the state rested at the end of the afternoon. (Respondent's Exhibit 1 vol. III at 106 to vol. IV at 312) The defense presented its case the next morning (Respondent's Exhibit 1 vol. IV at 328–70) and the jury returned a verdict early in the afternoon after only thirty-five minutes of deliberation. (Respondent's Exhibit 1 vol. IV at 417) Johnson was sentenced to imprisonment for sixty years, enhanced to life imprisonment because of his previous felonies. (Respondent's Exhibit 1 vol. I at 77–84; Respondent's Exhibit 1 vol. V at 364)

During opening statement the prosecutor alleged that Johnson violently raped the complainant in her bedroom in the middle of the night. The prosecutor told the jurors that both the complainant and her brother identified Johnson as the person inside their home that night and that Johnson, while fleeing, attempted to steal the videocassette recorder. The prosecu-

---

1. This order omits the complainant's name because she was a minor at the time of the offense.

tor also advised the jurors that a DNA test proved that Johnson's semen was recovered from the complainant. Finally, the prosecutor told the jurors that on the night after the incident a police officer spotted a man matching the description of the assailant, that the individual fled, that a K–9 officer found the man hiding in a nearby wooded area, that the individual was Johnson, and that the complainant selected Johnson's photograph as depicting the man who assaulted her. (Respondent's Exhibit 1 vol. III at 110–15)

The defense counsel's opening statement painted a decidedly different picture. Focusing on the lack of any physical evidence linking Johnson to the alleged crime scene, the defense counsel asserted that (1) despite the representation that the assailant touched many items inside the home, Johnson's fingerprints were not recovered from the alleged crime scene, either inside or outside the burglarized home; (2) despite testing, the bed sheets contained no hair or bodily fluid matching Johnson's, no bodily fluid matching the complainant's (even though she claimed she was menstruating at the time of the alleged rape), and no other physical evidence to support the rape allegation; and (3) despite the claim of a burglary, the police found no point of entry (all windows were securely protected with "burglar bars") and no evidence that a door had been forced. The defense counsel next explained that on the night of the alleged assault Johnson was "running around with" the complainant's mother and her boyfriend and that he later had consensual sexual relations with the complainant, for which he had promised her crack cocaine as payment. Concluding his opening statement by admitting to the jurors that Johnson fled when spotted by police, the defense counsel explained that Johnson was dragging "an enormous cardboard box across the parking lot" and that the box contained the "fruits of a burglary

of an automobile." (Respondent's Exhibit 1 vol. III at 116–24)

The complainant was the first witness. She testified that on the afternoon or evening of the assault she saw her mother drinking in the front yard with her mother's boyfriend and another person, whom the complainant identified later in the investigation as Johnson. The complainant testified that she visited her cousin later in the evening, returned home about midnight, and went to bed but was awakened by someone pushing her shoulder and saying, "Wake up, bitch." The complainant stated that the assailant told her to spread her legs and, when she refused, he began hitting her and that, despite her attempts to fight back, the assailant overpowered her, removed her clothes, and raped her. The complainant testified that she was menstruating at the time and was wearing a pad for protection. She testified that after the assailant left her bedroom she went into her mother's bedroom (her mother was absent), awakened her brothers, and called her grandmother on the telephone. (Respondent's Exhibit 1 vol. III at 126–31) The complainant testified that she and her brother entered the living room and saw the assailant drop the videocassette recorder and flee. (Respondent's Exhibit 1 vol. III at 134)

Initiating on direct examination an inquiry into the complainant's sexual history and her attitudes toward drugs, the prosecutor elicited testimony from the complainant that she had engaged in prior consensual sexual activity with only her boyfriend:

Q. Does your mom do drugs?

A. She used to.

Q. How did that affect your family?

A. We wasn't staying with her. We was staying with my grandmother.

Q. When she was doing drugs, was she there for you?

A. No.

Q. Is that the reason you don't like drugs?

A. Yes.

Q. Before the night that you were raped, ... had you ever had sex with anyone?

A. Yes.

Q. Who.

A. [Boyfriend's name].[2]

Q. How old is [boyfriend]?

A. Fifteen.

Q. Is he your boyfriend?

A. Yes.

Q. How long has he been your boyfriend?

A. For about two years.

Q. Before the night that you were raped, how long had it been since you had sex with [boyfriend]?

A. About a month.

Q. How many times had you had sex with him?

A. Once.

Q. [D]id you agree to have sex with Derrick Johnson on December 14th?

A. No.

Q. Did you agree to have sex with him in exchange for crack cocaine?

A. No.

(Respondent's Exhibit 1 vol. III at 139–40) On cross-examination the complainant testified that during the rape she screamed loudly in an attempt to awaken her brother and that the assailant claimed to have her mother's gun. (Respondent's Exhibit 1 vol. III at 148–50)

The second witness was the complainant's older brother,[3] who testified that he was awakened by the complainant's crying and by her talking to their grandmother on the telephone. The brother testified that, as he opened his bedroom door to enter the living room, he saw Johnson flee from the other side of the same door and out the front door. The brother stated that the living room was "junk[y]" (the videocassette recorder was on the floor, the sofa had been moved, and the cable box was unhooked) but that the room was not "junk[y]" when he went to bed. (Respondent's Exhibit 1 vol. III at 156–59) Although the brother failed during his testimony to identify Johnson as the intruder, he identified the person depicted in a photograph as the same person he saw in the doorway inside the residence the night of the incident.[4] (Respondent's Exhibit 1 vol. III at 163)

The complainant's brother, who had previously admitted that he considered himself a "light sleeper," testified on cross-examination that he heard nothing until he was awakened by the complainant using the telephone in his bedroom. He also testified that the assailant, with whom the brother came face-to-face in the doorway of his bedroom, was about his same height, six feet and one inch.[5] (Respondent's Exhibit 1 vol. III at 164–66)

The third witness was the complainant's grandmother. She testified that the complainant was crying and screaming on the telephone, "I've been raped." The grand-

2. This order omits the boyfriend's name because he was a minor.

3. This order omits the brother's name because he was a minor.

4. This identification is from a single photograph, State's Exhibit 10, rather than an identification from the photopak, State's Exhibit 6.

5. Upon leaving the witness stand, Johnson stood beside the complainant's brother "to give a height comparison after giving testimony about the relative heights". (Respondent's Exhibit 1 vol. II I at 167) Although the transcript fails to capture the information obtained visually by the jury during the height comparison, the Florida Department of Corrections website states that Johnson is five feet and six inches.

mother called the police and departed for the complainant's residence. The grandmother testified that her daughter, the complainant's mother, is addicted to cocaine, which, the grandmother claims, has provided the grandmother sixteen years of experience observing the behavior of a drug addict, her daughter. So informed (and apparently thereby qualified to the trial court's satisfaction to render an opinion), the grandmother testified that she has never seen the complainant behave like a drug addict. (Respondent's Exhibit 1 vol. III at 169–72)

The fourth witness, Corporal Blount, testified that he was the first officer to arrive at the residence and that he initially checked the outside of the residence to determine a possible point of entry. He found that the back door was secured and that each window was protected on the inside by burglar bars. Corporal Blount described the inside of the residence as "in disarray,"—the couch partially blocking the front door, the videocassette recorder "pulled out," and electrical wires "everywhere." He testified that he obtained a description of the assailant. (Respondent's Exhibit 1 vol. III at 172–83) On cross-examination the officer clarified by stating that he obtained this description from interviewing "people who were out and about in the neighborhood" and that the description was of someone "who had been around the neighborhood." (Respondent's Exhibit 1 vol. III at 183–84)

The fifth witness was Dr. Brooks, the treating physician at the hospital, who testified that the complainant tested negative for sexually transmitted diseases and that the complainant had an acute, half-centimeter, superficial, vaginal laceration, which he opined was caused by "an acute rape or attempted rape." In response to the prosecutor's renewed direct examination as to the complainant's sexual history, Dr. Brooks stated that he observed "rounded hymenal remnants," which meant that the complainant had "not participated in regular sexual activity, regular intercourse" and that she was not "a person who sold themselves on the street." (Respondent's Exhibit 1 vol. III at 190–93) (Apparently, Dr. Brooks concludes that a vaginal examination exhausts the question of the complainant's participation in the array of sexual services available for hire "on the street"—a dubious conclusion.) On cross-examination Dr. Brooks agreed with the description of the laceration as "a little less than a quarter of an inch." (Respondent's Exhibit 1 vol. III at 194) Dr. Brooks also confirmed that the complainant was menstruating on the night of the examination.

The sixth witness, Detective Herron, confirmed that he assumed command of the investigation upon his arrival at the residence. Det. Herron stated that, because the windows of the residence were "roll-out type windows," the burglar bars were on the inside of the windows and that "some of the windows were in poor condition, having the glass panes already broken out." (Respondent's Exhibit 1 vol. III at 202) However, the burglar bars were in "good condition," which prevented access to the residence through a window, and the front door, which contained a deadbolt, had "no fresh signs of physical force, pry marks, et cetera. . . ." (Respondent's Exhibit 1 vol. III at 205–06) Consequently, Det. Herron found no place for an intruder to enter the complainant's residence, although he directed the collecting of latent fingerprints from both inside and outside the residence. He testified that of the thirty prints lifted, "eleven of the prints . . . we have no idea who they belong to." (Respondent's Exhibit 1 vol. III at 210) After Johnson's arrest the following day, Det. Herron placed Johnson's booking photograph into a photopak, which he presented to the complainant, and she

selected Johnson's photograph. (Respondent's Exhibit 1 vol. III at 214–17)

The seventh witness, Sgt. Velar, testified that he was the initial supervisor at the residence before relinquishing control to Det. Herron. While searching the area the following night, Sgt. Velar observed an individual who matched the description of the assailant and who fled when Sgt. Velar approached. A tracking dog found the individual in a nearby wooded area. Sgt. Velar identified Johnson as that individual. (Respondent's Exhibit 1 vol. IV at 246–50) Johnson was arrested for burglary and grand theft because the box Sgt. Velar spotted him dragging contained material stolen in a car burglary that evening. (Respondent's Exhibit 1 vol. IV at 252)

The eighth witness was Officer Middleton, the K–9 handler dispatched to assist Sgt. Velar. Ofc. Middleton's dog found the suspect hiding in a wooded area near where Sgt. Velar had last seen the suspect. Ofc. Middleton identified Johnson as the person found hiding in the woods. (Respondent's Exhibit 1 vol. IV at 261–63)

The ninth and tenth witnesses were the complainant's two "cousins."[6] Both of the girls testified that the complainant was at their house the evening before the incident and that the complainant left to return home around midnight. (Respondent's Exhibit 1 vol. IV at 279–86)

The eleventh witness, Mary McMahan, was the serologist for the Florida Department of Law Enforcement who conducted the DNA testing of the vaginal swab and the menstrual pad and determined that the DNA from those items matched Johnson's DNA. (Respondent's Exhibit 1 vol. IV at 310–11) On cross-examination McMahan testified that she received no bedding on which to test for DNA. (Respondent's Ex-

hibit 1 vol. IV at 311) McMahan's testimony concluded both the first day of testimony and the state's case-in-chief.

The following morning, the defense first called the complainant's mother. She testified that on the evening preceding the incident she and her boyfriend, Eric Walker, were drinking liquor in the front yard when Johnson approached and asked for a shot of her liquor, which she gave him. She testified that Johnson drank the liquor and left. (Respondent's Exhibit 1 vol. IV at 329–30) On cross-examination she admitted that she and Walker had consumed two bottles of beer and two quarts of "Christian Brothers," that both she and Walker had a gun with them in the yard as they drank (she was trying to fit .38 caliber bullets into her .357 magnum pistol), and that Johnson saw the guns. (Respondent's Exhibit 1 vol. IV at 331–32)

The defendant testified next. Johnson testified that at the time of the incident he lived nearby in an abandoned warehouse. Johnson explained that with Walker's assistance he stole a bottle of liquor from an automobile in the neighborhood. After he shared the liquor with both Walker and the complainant's mother in the latter's front yard, the trio left in Walker's car to look for a "dope dealer" from whom they intended to "rip-off" cocaine to gratify their addictions. (Respondent's Exhibit 1 vol. IV at 333–35) Johnson testified that after the venture to "rip-off" cocaine proved unsuccessful, after Walker dropped Johnson on a corner, and after Johnson started walking in search of a cocaine dealer, Johnson met the complainant, who offered sex in exchange for cocaine. Johnson testified that he and the complainant entered an abandoned house in which they engaged in both oral and vaginal inter-

---

**6.** Neither is a true cousin. Each is a childhood friend. The names of the two girls will not be used because each was a minor.

course. Afterward Johnson admitted to the complainant that he had no drugs to offer her in payment, to which she stated, "I knew I should have gotten my damn money up front." (Respondent's Exhibit 1 vol. IV at 335–37)

On cross-examination Johnson stated that he never saw the complainant's mother with a gun in the front yard and that, acting as a group, Johnson, Walker, and the complainant's mother needed no gun because together they could steal drugs from a dealer through intimidation. He also stated that the reason he ran from the police was because the box he was dragging contained items he had stolen in a recent car burglary. (Respondent's Exhibit 1 vol. IV at 338–39) Johnson admitted to five felony convictions. (Respondent's Exhibit 1 vol. IV at 348) On redirect examination Johnson clarified that his prior convictions were resisting arrest with violence, two burglaries of a conveyance, and two grand thefts, and he stated that one burglary conviction and one grand theft conviction were based on the car burglary he committed the night of the arrest in the present case. (Respondent's Exhibit 1 vol. IV at 350)

Finally and crucially, the defense called, and the prosecutor objected to the defense's calling, Pernell Davis as the next defense witness, summoned to establish the complainant's prostitution and drug usage and, consequently, to impeach her direct testimony. The defense counsel promptly proffered that Pernell Davis would testify that the complainant, contrary to her direct examination, had committed prior acts of prostitution and used illicit drugs.

[DEFENSE COUNSEL]: He would testify that he lives in the neighborhood that the Gaines used to live in. He knows [the complainant's mother]. He know[s] [the complainant]. He knows [the complainant's sister] and all three

of them are seen frequently on street corners, obviously engaging in prostitution; that he has supplied drugs to all of them, specifically including [the complainant]; that on one occasion, he negotiated a sexual relation between a friend of his and [the complainant]; that he paid [the complainant] directly with I believe it was a rock; it may be more than one rock, but with crack cocaine and that about 10 feet from him, he was still in the room, he saw them take off their clothes and get in the bed. I don't think he can say that he actually saw what happened underneath the covers.

(Respondent's Exhibit 1 vol. IV at 355–56) The trial court rejected the proffer as insufficient to meet the "the predicate" in the rape shield law:

[DEFENSE COUNSEL]: My client has taken the stand and he says he had sex with [the complainant] as a prostitute and specifically in exchange for crack cocaine, but he didn't give her the crack cocaine. The State had talked quite a bit about her, put on—has managed to put on that she hates drugs, gotten that on of her from her grandmother, has put on testimony to the effect, according to the doctor, she does not appear to have—at least because she doesn't have any sexually transmitted diseases, she does not show any signs that she's been a prostitute. So to the extent, the State has been allowed to attempt to demonstrate the falsity of Mr. Johnson's testimony, and then he brings forth a witness to demonstrate the truth of it—

THE COURT: What do you mean "been allowed, the State has been allowed"?

[DEFENSE COUNSEL]: They put on testimony to that effect, anticipating presumably Mr. Davis' testimony. It would be our position that by putting on testimony about her hatred of drugs and the improbability of her being a prosti-

tute, that they have opened the door to testimony about whether she is or is not a prostitute, which has become directly relevant to this case, given my client's testimony. Indeed, this conceivably fits within 794.022 [the Florida Rape Shield Statute], a pattern of consent that shows the likelihood of consent in this particular case. *Consent being, as [the prosecutor] just said, the one and only issue in this case.* 794.022, and I'm not sure 794.022 applies in prostitution generally, but even if we were to take the language of that, 794.022 has been held to be a statutory recitation of the rule of relevance and—

THE COURT: Excuse me. Florida Statute 790.—

[DEFENSE COUNSEL]: 794.022, the rape shield statute.

THE COURT: Well, let's look at it. 790 point what?

[DEFENSE COUNSEL]: 794.022.

THE COURT: You mean .022?

[DEFENSE COUNSEL]: Yes, Your Honor.

THE COURT: You haven't met the predicate required by the statute itself.

[DEFENSE COUNSEL]: It's a pattern of consent, showing that—

THE COURT: One isolated incident is a pattern?

[DEFENSE COUNSEL]: He also testified that he had seen her getting in and out of cars, calling cars over, getting in and out of cars.

THE COURT: In other words, it's almost like Williams' Rule.

[DEFENSE COUNSEL]: It is somewhat like Williams' Rule.

THE COURT: Not somewhat; it says, "Tend to establish a pattern of conduct or behavior on the part of the victim which is so similar to the conduct or behavior in the case that it is relevant to the issue of consent."

[DEFENSE COUNSEL]: Correct.

THE COURT: Court finds that you have not laid the predicate to invoke 794.022, which specifically says that "specific incidences of prior consensual activity shall not be admitted into evidence except under certain limited circumstances." The Court finds you have not laid the proper predicate to come within the exception.

(Respondent's Exhibit 1 vol. IV at 359–61) (emphasis added) The court and the defense counsel then summarized each point of the proffered testimony:

THE COURT: Let's take the time ... to itemize each point that you wish to establish by Mr. Davis so that my ruling will apply to each of those points. You may possibly have some evidence that the State does not object to. What's the first point?

[DEFENSE COUNSEL]: Point one is that when I said recent past, I meant recent before December 15th, in a period of time not far before December 15, 1994, that Mr. Davis had seen [the complainant] on the street provocatively dressed, waving vehicles over to her, getting the vehicles to stop, getting in the vehicles, coming back relatively short periods of time later, emerging from the vehicles and often during that point, then buying crack cocaine from Mr. Davis. That would be essentially point one.

THE COURT: Wait a minute. State's objection to that testimony is sustained.

[DEFENSE COUNSEL]: Point two is that he personally negotiated with [the complainant] shortly before December 15, 1994[,] a sexual relations for crack cocaine for another individual[,] that he saw, that he personally handed the crack cocaine to [the complainant], that he saw the two of them take off their clothes and get into bed together after she had accepted the crack cocaine for sexual relations.

THE COURT: State's objection to that line of questioning is sustained.

[DEFENSE COUNSEL]: Judge, I would like to expand my argument to state that failure to allow Mr. Johnson to do this deprives him of his right to put on a defense under the Fifth Amendment to the United States Constitution.

THE COURT: Certainly that's understood.

[DEFENSE COUNSEL]: Unless you say it, you haven't federalized it and analogous portions of the Florida Constitution. And I really think only a lawyer could think that, could worry about whether prior incidents of prostitution and the alleged victim being a prostitute is marginal relevance in a case that—in which a defendant has said in a case that evolves around prostitution. Since you have ruled, I will cease.

(Respondent's Exhibit 1 vol. IV at 363–64) The defense rested. After a short mid-morning recess, the defense counsel supplemented the record with case authority supporting the admissibility of the proffered testimony:

[I]t's *Lewis v. State.* It's a 1991 Supreme Court case, 591 So.2d 922 (Fla. 1991). It's one of the first cases the supreme court determined the rape shield law, and basically it says the rape shield law has to be interpreted in light of the defendant's constitutional rights to both cross-examine and put on a defense, which is a point I believe I made, but I did not have a case to cite to say that and that's something the supreme court said, and I wish to get that on the record. But as I stated off the record, I was not going to reargue; I was just going to cite that case.

(Respondent's Exhibit 1 vol. IV at 368) The trial court persisted in excluding the testimony of Pernell Davis.

Freshly assured that his evidence would remain uncontested, the prosecutor began the closing argument with the following:

The Defense would have you believe that [the complainant] was a 13–year-old, 6th grader, crack addict and a prostitute. Why should you believe this about [the complainant]? Is it because she's poor? Is it because she lives in a bad neighborhood, or is it because she's black, or is it because a 5–time convicted felon has everything to benefit by making her look bad? I suggest to you that you ask yourselves the following question. If [the complainant] was white and if she lived in some fancy house in Carrollwood, would you consider for one minute that what this man said was true?

(Respondent's Exhibit 1 vol. IV at 371) The prosecutor reviewed the testimony of the complainant and her brother and disparaged any notion that they concocted their story. (Respondent's Exhibit 1 vol. IV at 373–75) The prosecutor also focused on the medical testimony, especially the tests that showed the complainant had no venereal disease and the doctor's findings that the complainant "still had rounded hymenal remnants, which was inconsistent with a person who is a street walker, who sells herself." (Respondent's Exhibit 1 vol. IV at 376) Finally, the state again featured the complainant's credibility:

Another indication that what the defendant would have you believe about [the complainant] is just not the truth. The truth is [the complainant] hates drugs because she has seen firsthand what drugs can do. She has seen what's happened to her mom and how that's affected the whole family.

(Respondent's Exhibit 1 vol. IV at 376)

The defense counsel's closing argument focused on the burglary charge rather

than the rape charge (apparently because, if the jury discredited the complainant's and her brother's identification of Johnson as the intruder, the jury necessarily would reject the complainant's claim that Johnson raped her). (Respondent's Exhibit 1 vol. IV at 379–93) Focusing on the absence of physical evidence to prove that Johnson entered the house, the defense counsel highlighted the absence of Johnson's fingerprints, the absence of hair or DNA evidence from the bedding, and absence of a point of entry into the house. The defense counsel highlighted also the absence of the complainant's blood on the bedding, "which you might have expected given her menstruation." (Respondent's Exhibit 1 vol. IV at 382) The defense counsel challenged the credibility of the brother's testimony, especially his admission that he was a light sleeper (as contrasted with the complainant's claim that she screamed during the rape), his inability to identify Johnson in the courtroom, and his incorrect description of both the height of the attacker and the clothes the attacker wore. (Respondent's Exhibit 1 vol. IV at 384–86) The defense counsel reminded the jurors that the description of the assailant was the product of a "neighborhood survey":

> In other words, he didn't get [the description] from [the complainant]. He obviously didn't get it from [the brother]. What he had was a description of someone who was hanging out in the neighborhood, which is conceded. Mr. Johnson took the stand and told you he was hanging out in the neighborhood during that period of time.

(Respondent's Exhibit 1 vol. IV at 386–87) The defense counsel also focused on the implication that the complainant was a prostitute and a drug user:

> You've heard about [the complainant's mother], her imprisonments, her drug addition, and you're told that [the complainant] reacted to that by hating drugs

and certainly that's a possible reaction. There are other possible reactions to growing up in a household like that. The State essentially accuses the Defense of racism for saying that the daughter of a multi-convicted felon and crack addict might be a prostitute and a crack addict. And, of course, the red herring or white herring perhaps is drawn across your path, what if she lived in Carrollwood in a fancy house. If she lived in Carrollwood in a fancy house, she wouldn't have a mother who is a multi-convicted felon, and, of course, you heard nothing about a father, and was a crack addict. A white person can live in the same neighborhood, have the same problems and can equally be on the street. Racism has nothing to do with this. And I'm not saying [the complainant] is not necessarily a long time crack addict, or a veteran street walker. I'm saying that she's done it some. There is a difference between a long term addict and a user. There's a difference between people who reap gonorrhea from prostitution, people who do it for ten years and been told she doesn't have any sexually transmitted diseases. If she had been relatively close to the beginning of that career, she could have been lucky. She could have also had them and gotten them cured by penicillin, but more likely, lucky.

(Respondent's Exhibit 1 vol. IV at 389–91)

In rebuttal the prosecutor responded, trumpeting the absence of the same evidence of complainant's prostitution and drug use that the prosecution excluded from evidence perforce the trial court's interpretation of the rape shield law:

> Because [the complainant's mother] is a doper and a convicted felon, that's supposed to make it easier for you to accept that [the complainant], her 13–year–old

daughter, is a crack addict and a prostitute. Because [the complainant] was unfortunate enough or is unfortunate enough to have a mother hooked on cocaine, that's not a reason to believe that she's either a crack addict or a prostitute. How fair is that? You're going to hold [the complainant's mother], what she does, against her daughter when there's absolutely no evidence that her daughter is anything other than a good girl, no evidence except from the mouth of a 5–time convicted felon who has everything to gain by making this child look bad?

(Respondent's Exhibit 1 vol. IV at 393–94) (emphasis added) The state also attacked Johnson's credibility:

[The defense counsel] points out to you in this case there is evidence which should cause you some doubt. He mentions the testimony of the defendant as being that evidence that should cause you some doubt. Ladies and gentlemen, if you do not believe Derrick Johnson, if you do not find his testimony credible for whatever reason, the fact that he's a 5–time convicted felon, the fact that he obviously has a motive to come in here and lie, you don't have to believe it and if you don't believe it, it can cause no reasonable doubt.

(Respondent's Exhibit 1 vol. IV at 396)

The trial recessed for lunch, after which the judge instructed the jury. (Respondent's Exhibit 1 vol. IV at 400–15) After a brief deliberation, the jury returned verdicts of guilty. (Respondent's Exhibit 1 vol. IV at 417) A life sentence followed.

## STANDARD OF REVIEW

Because this action commenced after April 24, 1996, 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996, governs these proceedings. *Wilcox v. Florida Dep't of Corrections,* 158 F.3d 1209, 1210

(11th Cir.1998), *cert. denied,* 531 U.S. 840, 121 S.Ct. 103, 148 L.Ed.2d 62 (2000). Creating a highly deferential standard for federal court review of state criminal adjudications, Section 2254(d) states:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), elaborates this deferential, statutory standard of review:

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives

at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus ... is on whether the state court's application of clearly established federal law is objectively unreasonable, ... an unreasonable application is different from an incorrect one." *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). *Accord Brown v. Head,* 272 F.3d 1308, 1313 (11th Cir.2001) ("It is the objective reasonableness, not the correctness *per se,* of the state court decision that we are to decide.").

Johnson explicitly and comprehensively raised on direct appeal (in an appellate brief of exemplary thoroughness and clarity) and preserved the claim asserted in Ground One.[7] (Respondent's Exhibit 2) Florida's Second District Court of Appeal summarily rejected Johnson's argument in a *per curiam* decision unaccompanied by an opinion and similarly denied rehearing without comment. (Respondent's Exhibits 5, 6, and 7)

### ANALYSIS OF GROUND ONE

Because he admitted sexual intercourse with the complainant (in other words, admitted to the felony of sexual intercourse with a minor), Johnson's sole defense to the more serious offense of conviction was consent, specifically that the complainant was a sometime prostitute and that the sexual encounter, procured by promise of payment in the form of crack cocaine, was consensual. Notwithstanding testimony during the prosecution's case evidencing the complainant's claimed abhorrence of drugs and her claimed sole episode of sexual intercourse, the trial court precluded the defense from introducing testimony that the complainant had engaged in prostitution (and procured drugs) before the incident with Johnson. This exclusion was based on Section 794.022(2), *Florida Statutes,* the Florida Rape Shield Law, which states:

Specific instances of prior consensual sexual activity between the victim and any person other than the offender shall not be admitted into evidence in a prosecution under § 794.011. However, such evidence may be admitted if it is first established to the court in a proceeding *in camera* that such evidence may prove that the defendant was not the source of the semen, pregnancy, injury, or disease; or, when consent by the victim is at issue, *such evidence may be admitted if it is first established to the court in a proceeding in camera that such evidence tends to establish a pattern of conduct or behavior on the part of the victim which is so similar to the conduct or behavior in the case that it is relevant to the issue of consent.*

(emphasis added) To procure the writ of habeas corpus, Johnson must establish that the trial court's decision was contrary to, or an unreasonable application of, controlling Supreme Court precedent.

■ Admittedly, a federal court's inquiry into state evidentiary rulings is limited to violation of a federally guaranteed right, *Nordskog v. Wainwright,* 546 F.2d 69, 72 (5th Cir.1977), such as the denial of fundamental fairness, *Hall v. Wainwright,*

---

7. The state's claim of procedural bar is meritless for the reasons amply stated in Johnson's reply at pages one through seven.

733 F.2d 766, 770 (11th Cir.1984), and the category of infractions that violates fundamental fairness is narrow. *Estelle v. McGuire,* 502 U.S. 62, 73, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Nonetheless, the constitution irreducibly protects a criminal defendant's right to "a meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

■ The right to present a defense free from categorical exclusions of competent, reliable, and unprivileged evidence of actual innocence is clearly established in the decisions of the United States Supreme Court, beginning no later than *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), in which Jackie *Washington's* former girl friend, Jean Carter, along with Carter's new boy friend and Carter's family were dining together when Washington, Charles Fuller, and others approached throwing bricks and carrying a shotgun. A confrontation occurred between Carter's mother, on the one hand, and Washington and Fuller, on the other. During the resulting fracas, a shotgun blast fired by either Washington or Fuller killed Jean Carter's new boy friend. Washington was charged with murder. Because the others in the group returned to their car before the shooting, only Washington and Fuller directly witnessed the murder, committed by one of them.

At trial, Washington testified in his own behalf and claimed that Fuller, who was drunk, carried both the shotgun and a stern resolve to kill someone, from which resolve Washington attempted to dissuade him. Washington attempted in his defense to elicit the testimony of Fuller, who earlier was convicted of the same murder and whose testimony Washington expected to corroborate Washington's testimony that Washington tried to stop the shooting. Fuller's testimony for Washington was excluded perforce two Texas statutes that together prohibited testimony for the defense by a person convicted of participation in the same crime but that permitted testimony by the same guilty participant in behalf of the prosecution.

Texas defended the statute as a rational mechanism to prevent perjurious testimony by a criminal in behalf of his criminal confederate ("each would try to swear the other out of the charge" 388 U.S. at 21, 87 S.Ct. 1920). Especially viewed in light of both the exception that permitted testimony in behalf of the prosecution from another participant in the same crime and the exception that permitted testimony from another participant if acquitted in a separate trial (which acquittal enables him to lie with virtual impunity), the Supreme Court found no adequate basis for the statutory infringement of the defendant's Sixth Amendment right to present a defense by offering exculpatory evidence.

First, the Supreme Court confirmed that, as a basic ingredient of due process of law, the "compulsory process" provision, along with the other provisions of the Sixth Amendment, applies to the states. *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948). Next, the Supreme Court explained that the right to secure the presence of a witness by compulsory process includes the right to the fruits of the witness's testimony, that is, the right to present a defense:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This

right is a fundamental element of due process of law.

388 U.S. at 19, 87 S.Ct. 1920. Denominating this "fundamental" constitutional entitlement as "the right to present a defense," the Supreme Court reversed (with no dissent but with a concurrence from Justice Harlan objecting to the application to the states of the Sixth Amendment through the Fourteenth Amendment) and stated:

> We hold that the petitioner in this case was denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense. The Framers of the Constitution did not intend to commit the futile act of giving to a defendant the right to secure the attendance of witnesses whose testimony he had no right to use. The judgment of conviction must be reversed.

388 U.S. at 23, 87 S.Ct. 1920. Notwithstanding the emphasis in *Washington* on preservation of the defendant's right to present a defense, the Supreme Court carefully preserved to the states the historical discretion to employ reasonable evidentiary limitations to ensure reliability and competence and to preserve testimonial privilege:

> Nothing in this opinion should be construed as disapproving testimonial privileges, such as the privilege against self-incrimination or the lawyer-client or husband-wife privileges, which are based on entirely different considerations from those underlying the common-law disqualifications for interest. Nor do we deal in this case with nonarbitrary state rules that disqualify as witnesses persons who, because of mental infirmity or

infancy, are incapable of observing events or testifying about them.

388 U.S. at 23, n. 21, 87 S.Ct. 1920.

Similarly (and most pointedly for the present case), in *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), a police officer, fatally wounded during a melee outside a bar in Woodville, Mississippi, on a Saturday night in June, 1969, managed (after suffering gunshot wounds) to fire toward some nearby participants two shots from his 12–gauge, sawed-off shotgun. The first shot was ineffective but the second shot struck Leon Chambers. Because another officer claimed that he saw Chambers shoot the deceased officer, Chambers was charged with murder.

A few months later another participant in the Saturday night melee in Woodville, Gable McDonald, after a counseling session with the Reverend Stokes, approached Chambers' lawyers and formally confessed in writing that he, not Chambers, shot the officer to death with his nine-shot, .22 caliber revolver. Also, McDonald confirmed that he confessed earlier to James Williams, a friend. But, another month later, McDonald repudiated his confession during a preliminary hearing before a justice of the peace, who accepted the repudiation and released McDonald, now claiming that the Reverend Stokes persuaded him to confess to the murder as part of an unholy scheme to appreciate the proceeds of a prospective lawsuit by Chambers against Woodville.

The prosecution of Chambers continued. One of Chambers' two defenses was that McDonald killed the officer and that McDonald confessed both to Chambers' lawyers and to others. As Justice Powell stated in his opinion for eight justices (Justice Rehnquist dissented):

> In large measure, [Chambers] was thwarted in his attempt to present this

portion of his defense by the strict application of certain Mississippi rules of evidence. Chambers asserts in this Court, as he did unsuccessfully in his motion for new trial and on appeal to the State Supreme Court, that the application of these evidentiary rules rendered his trial fundamentally unfair and deprived him of due process of law. It is necessary, therefore, to examine carefully the rulings made during the trial.... His claim, the substance of which we accept in this opinion, rests on the cumulative effect of those rulings in frustrating his efforts to develop an exculpatory defense.

410 U.S. at 289–90, 93 S.Ct. 1038.

During the defense case, Chambers summoned McDonald as a witness and published to the jury McDonald's written confession. On cross-examination the prosecutor elicited testimony about McDonald's repudiation of the confession, McDonald's denial that he shot the officer, and McDonald's claim that Reverend Stokes induced his false confession. On re-direct examination Chambers sought to cross-examine McDonald as an "adverse witness," but the trial judge precluded the cross-examination, invoked the ancient "voucher rule" (which precludes impeaching ones own witness, for whose veracity the offering party mythically "vouches"), and declared McDonald not "hostile" to Chambers "because nowhere did [McDonald] point the finger at Chambers." Chambers next sought to introduce the testimony of three other persons to whom McDonald confessed. The trial court excluded the testimony as inadmissible hearsay because McDonald's statements to the witnesses were contrary to McDonald's penal interest, rather than his pecuniary interest, the only interest established as a hearsay exception in Mississippi.

In practical effect, the trial court's ruling combined to preclude Chambers' offering, in his effort to establish a reasonable doubt, a complete and telling report of McDonald's serial confessions. As Justice Powell concluded:

> Few rights are more fundamental than that of an accused to present witnesses in his own defense. *E.g., Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972); *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948).... The testimony rejected by the trial court here ... was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

410 U.S. at 302, 93 S.Ct. 1038. *Chambers* holds that, absent a valid, strong, and persisting state interest in exclusion, the enforcement of a state evidence rule that stands athwart a defendant's effort to introduce competent, probative, reliable, and unprivileged evidence of actual innocence offends due process by impairing the defendant's fundamental right to present witnesses in his own defense.

In *Crane v. Kentucky,* 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), a sixteen year-old defendant a week after his arrest confessed "just out of a clear blue sky" to several crimes. Law enforcement transferred the defendant to a juvenile detention facility and continued the interrogation, after which the defendant retracted his earlier denial of responsibility for a fatal shooting and confessed. After his indictment for murder, the defendant moved to suppress the confession. Crediting the police officers' testimony that defendant confessed voluntarily, rather than the defendant's testimony that law enforcement coerced the confession, the trial

court denied suppression. Before trial the prosecution moved *in limine* to exclude evidence of coercion, claiming that evidence of coercion pertains only to the voluntariness of the confession, a fact for determination by the judge and not the jury. The defendant countered that the circumstances of the confession evidenced both voluntariness, an issue for the judge, and credibility, an issue exclusively for the jury. Because "under established Kentucky procedure a trial court's pre-trial voluntariness determination is conclusive and may not be re-litigated at trial," the Kentucky Supreme Court found that "the evidence that supported that finding may not be presented to the jury for any other purpose."

Granting the writ of certiorari, the Supreme Court reversed because excluding evidence of the circumstances of the confession "contributed to an evidentiary ruling that deprived the petitioner of his fundamental constitutional right to a fair opportunity to present a defense." A unanimous Supreme Court explained that a defendant's right to present a defense and offer exculpatory evidence yields only to a state's valid interest in excluding unreliable, irrelevant, and privileged evidence but that otherwise the clearly established constitutional right of a defendant to present a complete defense prevails:

> Moreover, we have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability-even if the defendant would prefer to see that evidence admitted. *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). Nonetheless, without "signal[ing] any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures," we have little

trouble concluding on the facts of this case that the blanket exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial. *Id.,* at 302–303, 93 S.Ct., at 1049–1050. Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, *Chambers v. Mississippi, supra,* or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, *Washington v. Texas,* 388 U.S. 14, 23, 87 S.Ct. 1920, 1925, 18 L.Ed.2d 1019 (1967); *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S., at 485, 104 S.Ct., at 2532; cf. *Strickland v. Washington,* 466 U.S. 668, 684–685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984) ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment"). We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard. *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 507–508, 92 L.Ed. 682 (1948); *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and "survive the crucible of meaningful adversarial testing." *United States v. Cronic,* 466 U.S. 648, 656, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657

(1984). *See* also *Washington v. Texas, supra,* 388 U.S., at 22–23, 87 S.Ct., at 1924–1925.

476 U.S. at 690–91, 106 S.Ct. 2142.

The gist of *Washington, Chambers,* and *Crane* is revealed tellingly in a condemning reference by Chief Justice Warren in *Washington* to "arbitrary rules that prevent whole categories of defense witnesses from testifying on the basis of a *priori* categories that presume them unworthy of belief." This characterization of certain evidentiary practices as categorical, arbitrary, and a *priori* adumbrates the requirement for careful judicial reflection if entertaining an objection from the prosecution to exculpatory evidence proffered by the defense and emanating from a competent witness whose testimony is not privileged and who has first-hand knowledge of information suggesting the actual innocence of the defendant. To exclude evidence of this character the state must demonstrate a strong and valid interest that is not merely abstract or hypothetical but that persists in the governing circumstances of each case. In every instance the trial judge must inquire with care and not rely dogmatically upon categorical, arbitrary, a *priori* exclusions.

■ Florida's rape shield law, a categorical and a *priori* exclusion subject to certain express statutory exceptions, requires vigilant attention to the facts of each case to determine if the valid state policy objectives incorporated into the general rule of exclusion must defer to the constitutional right of a defendant to present his defense. Florida's Supreme Court and Florida's district courts of appeal have acknowledged the dangers presented by the categorical and a *priori* nature of the rape shield law and have admonished the state trial courts by specific and express reliance upon the clearly established federal constitutional principle expounded in *Washington, Chambers, Crane,* and related cases.[8]

For example, *Roberts v. State,* 510 So.2d 885 (Fla.1987), presented the occasion for a thorough exploration by the Supreme Court of Florida's rape shield law, viewed with the benefit of *Chambers's* exploration of the fundamental federal constitutional right to present a defense. In June, 1984, Michelle Rimondi and two friends, drinking wine while parked at night at the beach, were accosted by Roberts, who approached while posing as a police officer but who soon murdered one person with a baseball bat and raped Rimondi. After Rimondi identified her assailant ("a black man wearing a shirt with the name 'Rick' on the front") and after a "tip" identifying Roberts as "Rick," Rimondi identified Roberts, who admitted his presence at the

---

8. *Holmes v. South Carolina,* 547 U.S. 319, 126 S.Ct. 1727, 1731, 164 L.Ed.2d 503 (2006) (Alito, J.) (a unanimous court states ". . . the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' This right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are 'arbitrary' or 'disproportionate to the purpose they are designed to serve.' " [citations omitted] ); *Michigan v. Lucas,* 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991); *Olden v. Kentucky,* 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988); *Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979); *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Card v. Dugger,* 911 F.2d 1494 (11th Cir.1990); *Knight v. Dugger,* 863 F.2d 705, 728–29 (11th Cir.1988); *Cikora v. Dugger,* 840 F.2d 893, 898 (11th Cir.1988); *Boykins v. Wainwright,* 737 F.2d 1539, 1545 (11th Cir.1984); *Wilkerson v. Turner,* 693 F.2d 121 (11th Cir.1982); *United States v. Melchor Moreno,* 536 F.2d 1042, 1045–46 (5th Cir.), *opinion supplemented on denial of reh'g,* 543 F.2d 1175 (1976); *Baker v. Wainwright,* 527 F.2d 372 (5th Cir. 1976).

beach but claimed he "picked up" Rimondi as she hitchhiked on the Rickenbacker Causeway near Key Biscayne. 510 So.2d at 887

During his testimony Roberts sought to bolster his claim that Rimondi entered Roberts' car voluntarily and talked with Roberts casually, rather than talking in the "forced and hostile dialogue" that Rimondi described. Roberts attributed to Rimondi statements that she worked for an "escort service" as a prostitute. The trial judge excluded this testimony under Florida's rape shield law. Florida's Supreme Court affirmed and noted that:

> Roberts was allowed to give his account of this conversation and to refute every aspect of Rimondi's testimony. Roberts testified that they "had general conversations about occupation." The only limit on Roberts' testimony was on the specific type of employment Rimondi was allegedly engaged in. We find that the exclusion of this one otherwise irrelevant and highly prejudicial aspect of Roberts' version of the conversation in no way hindered Roberts' presentation of a complete defense.

510 So.2d at 892. In other words, although Roberts' evidence about the putative prostitution was excluded as "irrelevant and highly prejudicial," the exclusion was harmless because the court permitted evidence of both the occurrence of a claimed, casual conversation and evidence of the conversation's contents. (Of course, unlike the Johnson prosecution in the present case, the Roberts prosecution offered no evidence of Rimondi's lifelong sexual virtue or any claimed abhorrence for hitchhiking.) Apropos Johnson's excluded testimony of prostitution and consent in the present case, Florida's Supreme Court expounded:

> Although this testimony would likely be relevant to a defense of consent, Roberts does not claim consent; he has consistently maintained he did not have sexual relations with Rimondi.

We recognize that if application of Florida's Rape Shield Law interfered with Roberts' confrontation rights or otherwise operated to preclude Roberts from presenting a full and fair defense, the statute would have to give way to these constitutional rights. *See Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

In *Roberts*, Florida's Supreme Court expressly acknowledges the intimate link between careful and fair application of Florida's rape shield law and *Chambers's* iteration of the constitutional right to present a defense. *Roberts* emphasizes the constitutional implication of exclusion in a case, such as the present case, in which a claim of consent (and prostitution) anchors the defense.

■ In *Robinson v. State*, 575 So.2d 699 (Fla. 1st DCA), *rev. denied*, 589 So.2d 292 (Fla.1991), which again addresses the application of Florida's rape shield law, the defendant in a sexual battery case was prohibited from cross-examining the complainant about whether she supported her narcotics addiction by prostitution, and the prosecution's motion *in limine* was granted to preclude defense testimony of specific acts of prostitution and a reputation for prostitution. Although affirming the conviction because the defense failed to proffer the excluded evidence, failed to offer evidence of incidents of prostitution, and offered only a suggestion of reputation evidence (all of uncertain probative value) and because the extreme level of violence against the victim rendered the issue of consent largely illusory, the court again invoked *Chambers* in explaining the constitutional boundary:

> A defendant's right to confront and cross-examine witnesses and to call witnesses in his own behalf are essential to

due process. *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). A statute prohibiting evidence of a certain class, even if for the worthy purpose of preventing witnesses from suffering humiliation on the stand, may not limit the Sixth Amendment right to confrontation guaranteed all defendants. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (shield law designed to preserve anonymity of juvenile defender set aside when it ran afoul of a defendant's right of confrontation—defendant should have been permitted to show bias of state's crucial witness by eliciting testimony concerning witness's juvenile record). In *Davis,* the United States Supreme Court balanced the defendant's right of confrontation against the state's policy of protecting the record of a juvenile offender and determined that under the circumstances of that case, the shield law should yield.

We agree with appellant's basic premise that evidence of prostitution may well have a bearing on the issue of consent where the defendant's defense is that the sexual encounter which he had with the victim was in connection with an act of prostitution.

575 So.2d at 702–03. *See also Lewis v. State,* 591 So.2d 922, 925 (Fla.1991) ("We recognize the public policy underlying this rule, i.e., that a victim of a sexual assault should not be subjected to having her sexual history brought up in open court, but hold that where, as occurred in this case, application of this rule interferes with confrontation rights, or otherwise precludes a defendant from presenting a full and fair defense, the rule must give way to the defendant's constitutional rights."); *McLean v. State,* 754 So.2d 176, 182 (2d DCA 2000) ("The supreme court has held that the statute must give way if it interferes with a defendant's constitutional right to confrontation or denies the defendant the

opportunity to present a full and fair defense."). The governing question is whether the trial court unreasonably disregarded clearly established federal constitutional law by ruling that the state's interest in excluding the testimony outweighed Johnson's right to present the defense of consent, that is, whether the trial court's ruling was contrary to, or an unreasonable application of, *Washington, Chambers, Crane,* and related cases.

At the moment that the trial judge confronted the proffered testimony of Pernell Davis, the outcome of the case was starkly contingent upon the single question of the complainant's credibility. To recapitulate: Johnson admitted that he had sex with the complainant but claimed that she agreed to sex in exchange for drugs and that this commercial arrangement was consummated in an abandoned warehouse. During the prosecution's case, the complainant claimed both a minimal sexual history and an abhorrence of drugs, and the complainant claimed that Johnson raped her in her bed in her apartment. The state presented no physical evidence, i.e., no hair, no semen, no menstrual residue, that sexual intercourse occurred in the complainant's bed. Although outwardly uninjured and unmarked by bruises or the like, the complainant claimed that she struggled against Johnson and screamed in a vain effort to awaken her brother, an admitted "light sleeper" who, having slept through the alleged screaming, claims he was awakened by the complainant using the telephone. The complainant and her brother claimed that Johnson held a videocassette recorder that he attempted to steal from the apartment after the rape but, although the scene was comprehensively investigated, the state presented no fingerprint evidence proving Johnson touched anything in the apartment and failed to establish a site for Johnson's supposed entry (despite barred windows and a dead-bolted door)

into the house. In short, the only evidence placing Johnson inside the residence and in the complainant's bed is the testimony of the complainant and the shaky, equivocal testimony of the complainant's brother.

The complainant's credibility was manifestly the linchpin of the state's case. Establishing mendacity in her testimony about her sexual history and about her attitude toward drug usage would directly and crucially suggest mendacity in her testimony about her sexual encounter with Johnson. In this context, the trial judge considered Pernell Davis's proffered testimony that the complainant, her mother, and her sister are prostitutes, seen frequently by Davis soliciting on the streets ("provocatively dressed, waving vehicles over to her, getting the vehicles to stop, getting in the vehicles, coming back in relatively short periods of time later, emerging from the vehicles, and often during that point, then buying crack cocaine from Mr. Davis"); that Davis has supplied drugs to the complainant, to her mother, and to her sister; and that in behalf of a friend Davis recently had negotiated an agreement with the complainant for sex in exchange for crack cocaine (which he handed to her and she accepted) and observed the complainant and the friend retire naked to a bed to implement the meretricious arrangement.

The trial judge excluded Pernell Davis's testimony based purportedly on Florida's rape shield law, which excludes evidence of "prior consensual sexual activity between the victim and any person other than the offender" but which, in recognition of well-established constitutional principles and additional prudential considerations, includes an exception that permits "such evidence ... if it is first established to the court in a proceeding *in camera* that such evidence tends to establish a pattern of conduct or behavior on the part of the victim which is so similar to the conduct or

behavior in the case that it is relevant to the issue of consent." Although excluding Pernell Davis's testimony under Florida's rape shield law, the trial judge never undertook to explain why evidence of the complainant's and her family's soliciting sex for cash on the streets and the victim's accepting crack cocaine for sex on a recent occasion do not, at least, "tend" to establish a "pattern of conduct" that is, at least, "relevant to the issue of consent," most particularly in a case in which the defendant claims the alleged rape was actually a consensual arrangement to exchange drugs for sex and in which the complainant is a person whose credibility, which is outcome determinative, depends on whether she is only lightly experienced sexually and whether she abhors the use of drugs.

The trial judge's failure to explain the exclusion of Pernell Davis's testimony leaves provocative questions: Is testimony that the complainant has a history of street solicitation for sex irrelevant to the issue of whether she lied when she testified she was only lightly experienced sexually? Is testimony that the complainant has a history of street solicitation for sex in order to earn cash for drugs irrelevant to the issue of whether she lied when she testified that she abhors drugs? Is testimony that the complainant has a history of street solicitation for sex irrelevant to the issue of whether she lied when she testified that she did not consent on the occasion of her sex with Johnson? Is testimony that, through the arrangements of an intermediary, she accepted crack cocaine for sex on a recent occasion irrelevant to the issue of whether she lied when she denied agreeing to sex with Johnson in exchange for drugs, as well as whether she lied about her sexual history and her abhorrence of drugs?

But, rightly or wrongly, the trial judge (without explanation, except to say opaque-

ly that "you haven't met the predicate required by the statute itself") found Pernell Davis's testimony entirely inadmissible by operation of Florida's rape shield law, the interpretation of which is exclusively a matter of state law for determination by Florida courts, which affirmed the trial court (and also failed to elaborate). Because the dubious merit of this interpretation of Florida's rape shield law properly evades federal review, the sole recurring question in deciding this petition for the writ of habeas corpus is whether Florida's interpretation and application of the rape shield law in this case was contrary to, or an unreasonable application of, controlling Supreme Court precedent, in particular *Washington, Chambers, Crane,* and related cases (and, as well, those cases applying these precedents in the Eleventh Circuit and the Supreme Court of Florida).

The correctness of the trial court's interpretation of Florida's rape shield law aside, the remaining question whether the trial court's interpretation and application of Florida's rape shield law is contrary to, or an unreasonable application of, regnant federal constitutional principles expounded by the Supreme Court equals the question whether Florida possessed a strong, valid, and persisting interest in excluding Pernell Davis's testimony, which interest at the time of the trial court's exclusion of the testimony remained sufficient to outweigh Johnson's right to present a defense by proffering competent, probative, reliable, and unprivileged evidence of actual innocence, i.e., evidence that the complainant committed prostitution, evidence that tended to prove her perjury, and evidence that tended to prove her consent. The resolution of this question begins with an examination of the rape shield law.

Florida's rape shield law is a statutory expression of a particular application of the rule of relevance. *Marr v. State,* 494 So.2d 1139, 1142 (Fla.1986) ("We view this section as essentially an explicit statement of the rule of relevancy.... The only time the victim's prior sexual activity with a third person is relevant is when such evidence may show the accused was not the perpetrator of the crime or if the defense is consent by the victim."); *Kaplan v. State,* 451 So.2d 1386, 1387, (Fla 4th DCA 1984) ("Section 794.022(2), *Florida Statutes* (1983), is merely a codification of this jurisdiction's rule of relevance as it applies to the sexual behavior of a sexually battered victim.") Analysis commends the statute's evidentiary proscription as soundly grounded in both reason and experience. Accordingly, evidence of sexual history typically is excluded to protect the complainant's reasonable expectation of privacy, to avoid invasive and demeaning inquiry into a complainant's intimate conduct, to encourage the reporting and pursuit of complaints of sexual battery, and to avoid the prejudice that results from the introduction of a distracting, confusing, and inflammatory irrelevancy.

But the salutary purposes of Florida's rape shield law were tactically and forever abandoned and rendered superfluous by the prosecution in Johnson's trial during the prosecution's case-in-chief when the prosecutor interrogated the complainant on direct examination about her sexual history and later interrogated a physician about the complainant's sexual history. The prosecutor's purpose was to create peremptorily an air of innocence about the complainant, based on her claimed sexual inexperience, excepting only a single incident of youthful sexual indiscretion with her boyfriend. The complainant's testimony about her minimal sexual experience aggressively anticipated the prospective presentation of Pernell Davis's testimony about the complainant's prostitution and aimed to impress the jury by a "first strike" featuring the complainant's putative sexual inexperience and good charac-

ter. (In response to the petition for habeas corpus, the state describes this evidence as "anticipatory rehabilitation of the victim," as if that "high-fallutin" characterization adequately excuses introducing the testimony about sexual history, lessens the lopsidedness of the resulting trial, or lessens the resulting offense against applicable constitutional principles. [Doc. 43 at 15.]) The direct testimony from the complainant about her sexual history and her claimed abhorrence of drugs places two issues centrally before the jury: Is the complainant sexually inexperienced, as she claims? Is the complainant repulsed by the use of illicit drugs, as she claims? Of course, both issues present the same question: is the complainant truthful in her testimony, including her accusation against Johnson?

Any person even minimally conversant with the proper course of a trial knows that the prosecutor's direct evidence of sexual inexperience and drug use "opens the door" to the subject and relinquishes any objection the prosecution otherwise possessed to cross-examination or other defense evidence exploring (from the defense's vantage) the subjects of sexual history and drug usage or otherwise exploring the veracity of the complainant's testimony on direct examination. Evidence on a subject that is relevant and probative in the prosecution's case remains relevant and probative in the defense case; hence, the concept of "opening the door." Otherwise, the prosecution revels (as did the prosecutor in this case) in a windfall opportunity to offer during the prosecution's case testimony that is damning to the defendant but that is not subject to a testimonial contest in the defense case—unchallengeable testimony, the antithesis of a fair trial.

Stated more pointedly, owing to the testimony from the complainant and the physician on direct examination during the prosecution's case-in-chief about the complainant's sexual history and her abhorrence of drugs and owing to the prosecution's strategic considerations triggered by the expected testimony of Pernell Davis (after all, the prosecution hardly could have foreseen the surprising bonus opportunity to offer unchallengeable testimony of sexual innocence and the abhorrence of drugs), the state aggressively exploited evidence of the complainant's sexual history and drug usage and thereby relinquished any legitimate interest justifying exclusion under Florida's rape shield law of Pernell Davis's contradictory testimony about the complainant's sexual history and drug usage. The complainant's sexual history became a prime topic for defense inquiry because of questions asked by the state and answered by the complainant. The state retained no enforceable interest in shielding the sexual history and drug usage of the complainant from further examination; the state retained no enforceable interest in shielding the veracity of the complainant from further examination; the state retained no enforceable interest in shielding the question of Johnson's innocence or guilt from a full examination. Because the state retained no enforceable interest in precluding inquiry into the sexual history and drug usage of the complainant, the trial court's refusal to permit Johnson to introduce competent, probative, reliable, and unprivileged evidence by Pernell Davis of Johnson's actual innocence was contrary to, or an unreasonable application of, controlling Supreme Court precedent, in particular *Washington, Chambers, Crane,* and related cases (and, as well, those cases applying these precedents in the Eleventh Circuit and the Supreme Court of Florida).

The inevitable followed in due course after the exclusion of Pernell Davis's testimony. The prosecution during summation pounded into the jury the testimony about the alleged rape, the alleged sexual inex-

perience, and the alleged abhorrence of drugs. Not content to argue from the admitted evidence, the prosecution pounded into the jury the absence of responsive evidence from Johnson, i.e., the absence of evidence establishing a history of meretricious sexual activity or drug use by the complainant. The prosecution characterized the evidence as presenting a contest of credibility between a convicted felon, on the one hand, and an innocent, virtuous, early teenager, on the other. "[T]here's absolutely no evidence that [the complainant] is anything other than a good girl, no evidence except from the mouth of a five-time convicted felon who has everything to gain by making this child look bad," the prosecutor argued. The prosecutor argued in this vein despite knowing that contrary evidence existed, that the evidence was decidedly exculpatory, and that the evidence was excluded at the prosecution's behest and by an unexplained and inexplicable application of Florida's rape shield law. The prosecutor argued audaciously and opportunistically, having procured exclusion on the basis of Florida's rape shield law of the exact evidence he boldly claimed was lacking.

The trial of Derrick Johnson was deeply flawed, pointedly imbalanced, and fundamentally unfair, owing principally to denial of Johnson's well-established constitutional right to present a defense and establish his innocence. Even assuming (however implausibly) that the trial court correctly interpreted Florida's rape shield law and properly (but tentatively) excluded Pernell Davis's testimony based on Florida's rape shield law, well-established constitutional principles articulated in *Washington, Chambers, Crane,* and other cases and entitling Johnson to present a defense (1) required the trial court to balance carefully the interest, if any, of the state in excluding the testimony against the right of Johnson (at pain of the loss of his liberty for the balance of his life) to pres-

ent a defense and establish his innocence and (2) required the trial court, if Johnson's interests were greater, to receive Pernell Davis's testimony notwithstanding the statute. As Florida's court of appeal stated in *Robinson:*

> Should a defendant make a sufficient showing through an offer of proof on the record, or by other appropriate means, that the evidence of prostitution bears materially on the issue of consent, and that without the opportunity to elicit that evidence the defendant's ability to present a defense will be critically hampered, then the trial court should engage in a balancing test to weigh the probative value of the evidence against the unfair prejudice to the victim and the state's case to determine if it should be admitted.

575 So.2d at 702–3. Because the state relinquished its interest in protecting the sexual history and drug usage of the complainant from defense inquiry and because Johnson's interest in presenting a defense remained vitally important, the balance tilted heavily toward admitting the testimony of Pernell Davis. The trial court either failed to balance these interests or erroneously balanced these interests. Therefore, the trial court reached a result that was either contrary to (if the trial court failed to balance), or an unreasonable application of (if the trial court balanced erroneously), well-established constitutional principles propounded by the Supreme Court of the United States. As the Supreme Court of Florida stated in *Roberts:*

> We recognize that if application of Florida's Rape Shield Law interfered with Roberts' confrontation rights or otherwise operated to preclude Roberts from presenting a full and fair defense, the statute would have to give way to these constitutional rights. *See Chambers v.*

*Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

510 So.2d at 892. The writ of habeas corpus must issue.

## CONCLUSION

Accordingly, the petition for the writ of habeas corpus (Doc. 1) is **GRANTED.** A writ commanding Johnson's release will issue unless the State of Florida affords him a new trial within one hundred eighty (180) days. This paragraph of this order is stayed until the expiration of the time within which to appeal (if no appeal occurs) or the issuance of a mandate by the court of appeals (if an appeal occurs).

The parties shall file a joint status report within sixty (60) days. The clerk shall not enter a judgment pending further order, depending upon the state's compliance, but the clerk shall **ADMINISTRATIVELY CLOSE** this action.

ORDERED.